# EXHIBIT A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| PARAMOUNT FINANCIAL COMMUNICATIONS, INC. D/B/A PLAN MANAGEMENT CORP. AND JONATHAN MILLER | : : : | CIVIL ACTION |
| Plaintiffs, | : : | No. 2:15-cv-00405-JD |
| v. | : : |  |
| BROADRIDGE INVESTOR COMMUNICATION SOLUTIONS, INC. | : : |  |
| Defendant. | : : |  |

### PLAINTIFFS' FIRST SET OF REQUESTS FOR ADMISSIONS DIRECTED TO DEFENDANT BROADRIDGE INVESTOR COMMUNICATION SOLUTIONS, INC.

Plaintiffs, Paramount Financial Communications, Inc. d/b/a Plan Management Corp. and Jonathan Miller (collectively "Plaintiffs"), by and through their undersigned counsel, Henry Ian Pass, Esquire, propound the following First Set of Requests for Admission upon Defendant Broadridge Investor Communication Solutions, Inc. ("Defendant" or "Broadridge").

Pursuant to the Federal Rules of Civil Procedure, Plaintiff hereby requests that Defendant Broadridge provide verified written responses within thirty (30) days of service to the following Requests for Admission ("Requests") in accordance with the instructions and definitions set forth below.

### I. INSTRUCTIONS

1.     In addition to the specific instructions enumerated below, these Requests incorporate by reference the instructions set forth in Rules 26 and 36 of the Federal Rules of Civil Procedure.

2.     Each request for admission shall be answered separately and fully in writing under oath. The answers are to be verified by the person making them.

3.     These requests shall be deemed admitted unless a full and complete written

answer is served within 30 days of service of these requests.

4.     These instructions and definitions should be construed to require responses based upon the knowledge of, and information available to, Defendant Broadridge, its parent, Broadridge Financial Solutions, Inc., its affiliated companies and their respective agents, employees, representatives, and attorneys.

5.     You must answer each Request for Admission with an admission, a specific denial, or a statement detailing why the request cannot truthfully be admitted or denied.

6.     Your answer shall specifically admit or deny the matter or set forth in detail the reasons why you cannot truthfully admit or deny the matter. A denial shall fairly meet the substance of the requested admission, and when good faith requires that you qualify an answer or deny only a part of the matter of which an admission is requested, you shall specify so much of it as true and qualify or deny the remainder with reasonably sufficient detail.

7.     If your Answer to any Request is anything other than an unqualified admission, describe in detail the reasons and basis for that Response.  To be complete, Your Response must include the substance of the reasons and basis for that Response, the identity and date(s) of any Communications or Documents evidencing the substance of the reasons and basis for that Response, the identity of the person(s) making such Communications, the identity of the person(s) to whom such Communications were made, and the method by which the alleged reasons and basis for that Response were communicated.   To the extent You allege any statements were in writing, please also identify with particularity the document that You contend contained the statement and provide a copy of same in accordance with Plaintiffs' Second Set of Requests for Production served concurrently herewith.

8.     If you cannot answer any Request in full after exercising due diligence to secure the full information to do so, so state and answer to the extent possible, setting forth in detail the reasons why you cannot truthfully admit or deny the matter and detailing what you did in

attempting to secure the purported unknown information.  If you have sufficient information for only a partial admission, you should indicate so and state why only a partial admission is given.

9.     No part of a Request shall be left unanswered merely because an objection is interposed as to any part thereof.  If an objection is made to any of these requests, the reason therefore shall be stated in reasonable detail.

10.     If You object to any Request or portion thereof, please specify Your objection and furnish an answer to all portions of such Request to which You have no objection.  If You contend that You lack knowledge to answer any Request or portion thereof, designate which portion of such answer is not within Your knowledge, and state the name and address of each and every person from whom an answer could be received; or, if the source of information is documentary in nature, provide a full description of the document, including the location thereof and provide a copy of same in accordance with Plaintiffs' Second Set of Requests for Production served concurrently herewith.

11.     If any Request calls for facts, documents, information, or other materials that You claim are privileged, identify the specific privilege claimed and set forth in detail the basis for Your assertion of that privilege, including identifying by name and role all persons whose involvement is relevant to the privilege.   If Your assertion of the privilege goes only to part of the Request, You must provide all information responsive to that portion of the Request for which You do not assert the privilege.

12.     These Requests seek responses that are complete and fully responsive as of the date the responses are executed, and which reflect or embody all relevant information and documentation within the possession, custody or control of Defendant Broadridge, its parent company, Broadridge Financial Solutions, Inc., its affiliated companies, and their respective agents, employees, representatives, and attorneys as of that date. Should Defendant

Broadridge later learn that any response was incomplete, incorrect when made, or though correct when made is no longer accurate, the response shall be timely supplemented.

13.   Unless another time period is specifically stated, all requests for admission are for the Period defined in the Definitions section below.

## II. Definitions

1.   "Admissions" means statements made by Defendant's counsel in his Correspondence dated June 25, 2014 attached as Exhibit C to Plaintiff's Complaint, that Broadridge did not refer Viable Clients to Plan Management because, putatively, Plan Management lacked the infrastructure to support the types of services required by Broadridge's clients and the name recognition in the industry necessary to compete for the types of clients served by Broadridge's transfer agent business, as alleged in Paragraph 41 of the Complaint.

2.   "Admissions Letter" means Defendant's counsel's letter dated June 25, 2014 attached as Exhibit C to Plaintiff's Complaint.

3.   "Agreements" means the following Agreements signed on March 8, 2010 in order to effectuate the Transactions:

a.   "Consulting Agreement" means that certain Consulting Agreement entered into between BOSI, PMC, WG Consulting, LLC and J. Miller.

b.   "Escrow Agreement" means that certain Escrow Agreement entered into between BOSI, J. Miller, C. Miller and Citibank, N.A., as Escrow Agent;

b.   "Marketing Agreement" means that certain Marketing Agreement entered into by and among the Parties;

c.   "Services Agreement" means that certain Services Agreement entered into between StockTrans and Plan Management; and

4

d.      "SP Agreement" means that certain Stock Purchase Agreement entered into by and among BOSI, J. Miller and C. Miller.

4.      "Answer" means the Answer to the Complaint and Affirmative Defenses filed by the Defendant in this Action and all amendments thereto.

5.      "BOSI" means Broadridge Output Solutions Inc. as well as its agents, Representatives, attorneys, and all other Persons alleged to be acting on its behalf.

6.      "Broadridge Affiliate" means any entity that controls, is controlled by, or is under common control with Broadridge.

7.      "C. Miller" means Christina Miller, wife of J. Miller, as well as her agents, Representatives, attorneys, and all other Persons alleged to be acting on her behalf.

8.      "Calendar Entries" means any written or electronic memorialization of appointments, meetings, or events occurring on a particular date and time.

9.      "Communications" shall mean discussions, conferences, or any form of oral or written contact whatsoever, including, but not limited to, letters, memoranda, notes, personal meetings, emails, and telephone calls.

10.     "Complaint" means the Complaint filed in this Action.

11.     "Concerning" or "Relating To" means referring to, relating to, concerning, describing, evidencing, or constituting.

12.     "Correspondence" means letter, memorandum or other Document used to communicate among individuals or business entities.

13.     "Date" means the exact day, month and year, if ascertainable, or, if not, the best approximation including the relationship to other events.

14.     "Defendant", "Broadridge" and/or "You" means Defendant Broadridge Investor

Communication Solutions, Inc., its parent Broadridge Financial Solutions, Inc., its affiliated companies, and their respective agents, employees, representatives and attorneys, and all other Persons alleged to be acting on their behalf.

15.    "Describe" means to describe fully by reference to underlying facts rather than by ultimate facts and conclusions of fact or law and to describe specifically as to time, place and manner.

16.    "Document Requests" means Plaintiffs' Request for Production of Documents to You in this Action.

17.    "Documents" is an all-inclusive term referring to any writing and/or recorded or graphic matter, however produced or reproduced.   The term "Documents" includes, without limitation, Correspondence, memoranda, inter-office Communications, minutes, reports, notes, schedules, analyses, drawings, diagrams, tables, graphs, charts, maps, surveys, books of account, ledgers, invoices, purchase orders, pleadings, questionnaires, contracts, bills, checks, drafts, diaries, logs, proposals, print-outs, recordings, telegrams, films, and all other such Documents tangible or retrievable of any kind.  "Documents" also include any preliminary notes and drafts of all the following, in whatever form, for example: printed, typed, longhand, shorthand, on paper, paper tape, on computer disk, on computer software, tabulating coins, ribbon blueprints, magnetic tape, microfilm, film, motion picture film, or other form.   "All documents" means every Document, whether an original or a copy, and whether or not in Your possession, custody or control, which is known to You and every Document which can be located or discovered by reasonably diligent efforts.

18.    "ESOPA Services" means the provision of employee stock option plan administration services to corporate issuers of securities.

19.     "ESPPA Services" means the provision of employee stock purchase plan administration services to corporate issuers of securities.

20.     "Interrogatories" means Plaintiffs' Interrogatories to You in this Action.

21.     "J. Miller" means Plaintiff Jonathan Miller, as well as his agents, Representatives, attorneys, and all other Persons alleged to be acting on his behalf.

22.     "Parties" means, collectively, the Plaintiffs and Defendant.

23.     "Period", unless otherwise indicated, means the period commencing March 10, 2010 through and including March 10, 2015.

24.     "Person" shall mean an individual, corporation, corporate division, partnership, company, trust, incorporated or unincorporated association, or any other entity of any nature.

25.     "Plaintiffs" means Plan Management and J. Miller, collectively, as well as their agents, Representatives, attorneys, and any and all other Persons alleged to be acting on their behalf.

26.     "Plaintiffs' Discovery Requests", means, collectively, the Interrogatories and Document Requests.

27.     "Plan Management" or "PMC" means Plaintiff Paramount Financial Communications, Inc. d/b/a Plan Management Corp., as well as its agents, Representatives, attorneys, and all other Persons alleged to be acting on behalf of any of them.

28.     "Pleadings" means, collectively, the Complaint and Answer.

29.     "Possession, custody or control" of Documents means possession, custody or control, or right to possession, custody or control, by You, including Your agents, attorneys, and all other Persons acting or purporting to act on Your behalf.

30.     "Referral Customers" means any customers, including but not limited to, Viable

Clients actually referred to Plan Management by Defendant Broadridge under the Marketing Agreement.

31.    "Referral Target" means the number of Viable Clients Defendant Broadridge agreed to refer to Plan Management during each year of the Agreement term as defined in Section 1 of the Marketing Agreement (200 the first year with a 110% increase each year thereafter for a five year total of 1,221).

32.    "Referring" or "Relating" means showing, disclosing, comprising, evidencing, constituting, or revealing directly or indirectly, in whole or in part.

33.    "Representative" means present or former officers, directors, principals, agents or employees or other Persons acting or purporting to act for or on Your behalf.

34.    "Responses to Plaintiffs' Discovery Requests", means, collectively, Your responses to Plaintiff's Discovery Requests.

35.    "Service Providers" means all companies other than Plan Management that were in the business of providing stock option plan administration services to third parties.

36.    "StockTrans" means StockTrans, Inc., as well as its agents, Representatives, attorneys, and all other Persons alleged to be acting on its behalf.

37.    "Transactions" means BOSI's March 10, 2010 purchase of the StockTrans stock from C. Miller and J. Miller and the undertakings required under the related Agreements entered into with respect to the Transactions.

38.    "Viable Clients", as defined in Section 1 of the Marketing Agreement, means a corporate issuer that has any type of securities or securities-related incentive plan or that expresses an interest in implementing such a plan and expresses to Plan Management or Broadridge an interest in learning about Plan Management's services and which observes a

demonstration of Plan Management's OptionTrax® system.

39.    "You" or "Your" refers to the Party to whom the following Interrogatories are addressed or any Representative of that Party.

40.    The conjunctions "and" and "or" shall be interpreted conjunctively and shall not be interpreted disjunctively to exclude any information otherwise within the scope of any Interrogatory. The word "or" means and/or.


III.  REQUESTS FOR ADMISSION


Request No. 1.  Please admit that Broadridge never notified PMC of a material breach by PMC of any obligation of PMC under the Marketing Agreement.

RESPONSE:


Request No. 2.  Please admit that the Initial Term of the Marketing Agreement automatically renewed for a successive one (1) year renewal term commencing as of March 10, 2015 ("Renewal Term") pursuant to Section 3(e) of the Marketing Agreement.

RESPONSE:


Request No. 3.  Please admit that Broadridge never notified PMC of its election to terminate the Marketing Agreement upon sixty (60) days' advance written notice at any time during the Renewal Term.

RESPONSE:

Request No. 4.   Please admit that Broadridge never attempted to terminate the Marketing Agreement other than through the putative notice letter dated January 9, 2015 attached hereto as Exhibit 1.

RESPONSE:

Request No. 5.   Please admit that PMC fully complied with its obligations under Section 8 of the Marketing Agreement without exception. If your response to this Request is anything other than admitted, then, in addition to adhering to the Instructions set forth on the first page, describe in reasonable detail all instances where PMC failed to fully comply with its obligations under Section 8 of the Marketing Agreement.

RESPONSE:

Request No. 6.   Please admit that Broadridge alleges that Broadridge fully complied with its obligations under Section 12 of the Marketing Agreement since March 8, 2010 without exception. If your response to this Request is anything other than admitted, then, in addition to adhering to the Instructions set forth on the first page, describe in reasonable detail all instances where Broadridge failed to fully comply with its obligations under Section 12 of the Marketing Agreement.

RESPONSE:

Request No. 7.   Please admit that Section 12 of the Marketing Agreement required Broadridge to refer to PMC Viable Clients seeking or in need of the following services in addition to ESOPA Services: (a) plan administration services for employee stock purchase plans for public or private companies (where the plan administrator (i) does not issue issuer share certificates or book entry positions on the books of the issuer, (ii) does not issue DWAC's shares, (iii) or issues DRS statements); (b) warrant plans or programs; (c) tax preparation, mailing and filing services unrelated to the Transfer Business; (d) employee/director/consultant equity compensation plans or programs, whether stock or cash settled, or (e) any other type of administration of materially similar incentive plans.

RESPONSE:

Request No. 8.   Please admit that Broadridge alleges to have fully performed all of its obligations under Section 14 of the Marketing Agreement. If your response to this Request is anything other than admitted, then, in addition to adhering to the Instructions set forth on the first page, describe in reasonable detail all instances where Broadridge failed to fully perform all of its obligations under Section 14 of the Marketing Agreement.

RESPONSE:

Request No. 9.   Please admit that Broadridge alleges to have fully complied with its obligations under item #1 set forth in Exhibit "B" to the Marketing Agreement without exception. If your response to this Request is anything other than admitted, then, in addition to adhering to the Instructions set forth on the first page, describe in reasonable detail all instances where Broadridge

failed to fully comply with its obligations under item #1 set forth in Exhibit "B" to the Marketing Agreement.

RESPONSE:

Request No. 10.   Please admit that Broadridge alleges to have fully complied with its obligations under item #2 set forth in Exhibit "B" to the Marketing Agreement without exception. If your response to this Request is anything other than admitted, then, in addition to adhering to the Instructions set forth on the first page, describe in reasonable detail all instances where Broadridge failed to fully comply with its obligations under item #2 set forth in Exhibit "B" to the Marketing Agreement.

RESPONSE:

Request No. 11.   Please admit that Broadridge alleges to have fully complied with its obligations under item #3 set forth in Exhibit "B" to the Marketing Agreement without exception. If your response to this Request is anything other than admitted, then, in addition to adhering to the Instructions set forth on the first page, describe in reasonable detail all instances where Broadridge failed to fully comply with its obligations under item #3 set forth in Exhibit "B" to the Marketing Agreement.

RESPONSE:

Request No. 12.   Please admit that Broadridge alleges to have fully complied with its obligations under item #4 set forth in Exhibit "B" to the Marketing Agreement without exception. If

your response to this Request is anything other than admitted, then, in addition to adhering to the Instructions set forth on the first page, describe in reasonable detail all instances where Broadridge failed to fully comply with its obligations under item #4 set forth in Exhibit "B" to the Marketing Agreement.

RESPONSE:

Request No. 13.  Please admit that, during the Period, Broadridge never acquired or merged with any company, including acquisition of a substantial portion of such company's assets, that provides Plan Administration Services (as defined in the Marketing Agreement), which, in the calendar year prior to the acquisition, had consolidated revenues from Plan Administration Services constituting more than one-third (33.33%) of the total consolidated revenue of such company.

RESPONSE:

Request No. 14.  Please admit that,

    (a)    Broadridge was not induced to enter into the Marketing Agreement by any representation or warranty not set forth in the Marketing Agreement;

    (b)    The Marketing Agreement contains the entire agreement and understanding of the parties with respect to its subject matter and supersedes all existing agreements and all other oral, written or other communications between them concerning its subject matter;

    (c)    The Marketing Agreement was not modified in any way;

    (d)    Broadridge has not assigned the Marketing Agreement.

If your response to this Request is anything other than admitted, then, in addition to

adhering to the Instructions set forth on the first page, describe in reasonable detail the reasons and basis for that response.

RESPONSE:

Request No. 15. Please admit that, before Broadridge entered into the Stock Purchase Agreement and Marketing Agreement, Broadridge had knowledge of the following positions communicated in writing to Broadridge or its counsel by or on behalf of Jonathan Miller and expressly set forth in the Bates stamped documents produced by Plaintiffs to Defendants appearing at the end of (a)-(d) below:

(a)  "We have been very forthright since we first started talking about the importance we place on the name, resources, synergies, and commitment that we expected Broadridge to put behind Plan Management, as we consider Plan Management a prime element of our personal futures. **We would never agree to a sale of StockTrans** on the basis we have talked about **without this essential part of the deal.**" [Emphasis added] [PARAMOUNT 00717-00718]

(b)  "I want to reiterate again . . . though, that **this deal also hinges on** a substantial marketing and sales effort, both measurable, for Plan Management." [Emphasis added] [PARAMOUNT 00658]

(c)  "Under any set of circumstances, and irrespective of the stock purchase agreement between us, any marketing arrangement of this nature would include a restrictive covenant of the type we inserted. The only other alternative would be for BR to buy PMC at an agreeable price." [PARAMOUNT 00892]

(d)  "As Broadridge has been aware from the start, Jon and Christina's ability to grow Plan Management through the synergies, cross selling and other 'partnership' strategies that Broadridge brings to the table has always been a mission critical driver of their decision to sell StockTrans to Broadridge in the first instance . . . ." [PARAMOUNT 001012]

RESPONSE:

Request No. 16.  Please admit that the Guarantee Agreement dated as of March 8, 2010, a copy of which is attached hereto as Exhibit 2, is currently in full force and effect and that Broadridge Financial Solutions, Inc., as Guarantor, is fully liable for any judgment obtained by Plaintiffs PMC and Jonathan Miller for claims against Broadridge Investor Communication Solutions, Inc. in the Complaint.

RESPONSE:

Request No. 17.  Please admit that in signing and sending those certain letters dated June 25, 2014 and September 10, 2014, respectively, in response to Plaintiff's counsel's letters of June 5, 2014 and August 7, 2014, respectively, Michael Adelman, Esq. was communicating Broadridge's position as Broadridge's counsel with full authority and approval to do so.

RESPONSE:

Request No. 18.  Please admit that Broadridge has produced to Plaintiffs all Documents in its possession, custody or control that are responsive to Plaintiffs' requests set forth in Plaintiffs' First Request for Production of Documents directed to Defendant other than Documents which Broadridge claims to be privileged pursuant to Defendant's Log of Documents Redacted and Defendant's Log of Documents Withheld provided to Plaintiffs on January 5, 2016.

RESPONSE:

15

Request No. 19.   Please admit that Broadridge never referred an existing or prospective corporate issuer client of Broadridge expressing an interest in obtaining ESOPA Services to any company providing ESOPA Services other than to PMC during the Period.

RESPONSE:

Request No. 20.   Please admit that Broadridge never referred an existing or prospective corporate issuer client expressing an interest in obtaining ESPPA Services to any company providing ESPPA Services other than to PMC during the Period.

RESPONSE:

Request No. 21.   Please admit that Broadridge has never directly provided ESOPA Services to any corporate issuer client of Broadridge from March 10, 2010 to the present.

RESPONSE:

Request No. 22.   Please admit that Broadridge has never provided ESOPA Services to any corporate issuer client of Broadridge from March 8, 2015 to the present except as expressly permitted under the Marketing Agreement.

RESPONSE:

Request No. 23.   Please admit that Broadridge never developed, either on its own or through any outsourcing relationship with any third party, any software systems or platforms

16

(including, without limitation, components of such software systems or platforms) for providing ESOPA Services to corporate issuers.

RESPONSE:

Request No. 24.  Please admit that Broadridge never developed, either on its own or through any outsourcing relationship with any third party, any software systems or platforms (including, without limitation, components of such software systems or platforms) for providing ESSPA Services to corporate issuers.

RESPONSE:

Request No. 25.  Please admit that Broadridge has no knowledge of any existing or prospective Broadridge client(s) during the Period that would have qualified as a Viable Client under the Marketing Agreement (after receiving a demonstration of OptionTrax as set forth therein) that Broadridge did not refer to PMC during the Period.

RESPONSE:

Request No. 26.  Please admit that Adam D. Amsterdam, whose signature appears on the signature page of the Stock Purchase Agreement, in his capacity as President of Broadridge Output Solutions, Inc., read and understood all of the terms, conditions and provisions of the SPA prior to signing it including, without limitation, Sections 6.8 and 6.9 of the SPA.

RESPONSE:

Request No. 27.  Please admit that Adam D. Amsterdam, whose signature appears on the signature page of the Marketing Agreement, in his capacity as President of Broadridge Investor Communication Solutions, Inc., read and understood all of the terms, conditions and provisions of the Marketing Agreement prior to signing it including, without limitation, Section 12 of the Marketing Agreement.

RESPONSE:

Request No. 28.  Please admit that Broadridge never notified Plan Management of any election to terminate the Marketing Agreement during the Renewal Term by providing PMC with sixty (60) days' advance written notice of such termination in accordance with Section 3 of the Marketing Agreement.

RESPONSE:

Request No. 29.  Please admit that the Employee Stock Option Plan or Plans of Broadridge Financial Solutions, Inc. have been administered solely by Broadridge during the period March 8, 2010 to date.  If the answer to the foregoing admission is other than an unqualified admitted, in addition to all other information required under the Instructions, please provide the identity or identities of all companies that provided such ESOPA Services during that time period.

RESPONSE:

Request No. 30.  Please admit that the Employee Stock Purchase Plan or Plans of Broadridge Financial Solutions, Inc. have been administered solely by Broadridge during the period

March 8, 2010 to date.  If the answer to the foregoing admission is other than an unqualified admitted, in addition to all other information required under the Instructions, please provide the identity or identities of all companies that provided such ESPPA Services during that time period.

RESPONSE:

Request No. 31.   Please admit that Section 1 of the Marketing Agreement required Broadridge to use commercially reasonable efforts to refer at least 200 Viable Clients to Plan Management by March 10, 2011.

RESPONSE:

Request No. 32.   Please admit that Section 1 of the Marketing Agreement required Broadridge to use commercially reasonable efforts to refer at least 220 Viable Clients to Plan Management by March 10, 2012.

RESPONSE:

Request No. 33.   Please admit that Section 1 of the Marketing Agreement required Broadridge to use commercially reasonable efforts to refer at least 242 Viable Clients to Plan Management by March 10, 2013.

RESPONSE:

Request No. 34.   Please admit that Section 1 of the Marketing Agreement required Broadridge to use commercially reasonable efforts to refer at least 266 Viable Clients to Plan Management by March 10, 2014.

RESPONSE:


Request No. 35.   Please admit that Section 1 of the Marketing Agreement required Broadridge to use commercially reasonable efforts to refer at least 292 Viable Clients to Plan Management by March 10, 2015.

RESPONSE:


Request No. 36.   Please admit that Section 1 of the Marketing Agreement required Broadridge to use commercially reasonable efforts to refer at least 321 Viable Clients to Plan Management during the automatic Renewal Term commencing March 10, 2015 and ending March 10, 2016.

RESPONSE:


Request No. 37.   Please admit that, had Broadridge elected to terminate the Marketing Agreement as of June 10, 2015, Section 1 of the Marketing Agreement required Broadridge to use commercially reasonable efforts to refer a minimum of 53 Viable Clients to Plan Management during the automatic Renewal Term commencing March 10, 2015 and ending June 10, 2016.

RESPONSE:

LAW OFFICES OF HENRY IAN PASS

By: _____

Henry Ian Pass, Esquire, Atty. ID No. 21437
3 Bala Plaza East, Suite 700A
Bala Cynwyd, PA  19004
Tel.:  (610) 660-8001
Fax:  (610) 660-8004
E-mail:  hip@hipesq.com

March 2, 2016                    *Counsel for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| PARAMOUNT FINANCIAL COMMUNICATIONS, INC. D/B/A PLAN MANAGEMENT CORP. AND JONATHAN MILLER | : | CIVIL ACTION |
| Plaintiffs, | : | |
| v. | : | No. 2:15-cv-00405-JD |
| BROADRIDGE INVESTOR COMMUNICATION SOLUTIONS, INC. | : | |
| Defendant. | : | |

### CERTIFICATE OF SERVICE

Henry I. Pass, attorney for Plaintiffs, hereby certifies that he caused a copy of the foregoing Requests for Admission Directed to Defendant Broadridge Investor Communication Solutions, Inc. to be served upon the following on March 2, 2016, by electronic mail and first class mail, postage prepaid:

Chanda A. Miller, Esq.
DRINKER BIDDLE & REATH LLP
One Logan Square, Suite 2000
Philadelphia, PA  19103
E-mail:  chanda.miller@dbr.com
*Counsel for Defendant*

Michael O. Adelman, Esq.
DRINKER BIDDLE & REATH LLP
600 Campus Drive
Florham Park, NJ 07932-1047
E-mail: michael.adelman@dbr.com
*Counsel for Defendant*

Henry I. Pass, Atty. I.D. No. 21437
LAW OFFICES OF HENRY IAN PASS
3 Bala Plaza East, Suite 700A
Bala Cynwyd, PA 19004-1117
(610) 660-8001 (phone)
(610) 660-8004 (fax)
hip@hipesq.com (e-mail)

March 2, 2016

*Attorney for Plaintiffs*

**Exhibit 1**

 **Broadridge**®

*51 Mercedes Way*
*Edgewood, NY 11717*

January 9, 2015

Paramount Financial Communications, Inc.
d/b/a Plan Management Corp.
44 Lancaster Avenue
Ardmore, Pennsylvania 19003
Attn: President

**VIA ELECTRONIC AND U.S. MAIL**

Re:   **March 8, 2010 Marketing Agreement between Broadridge Investor Communication Solutions, Inc. and Paramount Financial Communications, Inc. d/b/a Plan Management Corp.**

Dear John:

By this written notice, Broadridge Investor Communication Solutions, Inc. ("***Broadridge***") herby terminates the Marketing Agreement dated March 8, 2010 between Broadridge and Paramount Financial Communications, Inc. d/b/a Plan Management Corp. ("***Marketing Agreement***"), pursuant to Section 3(b)(ii) of the Marketing Agreement, effective as of March 10, 2015.

Very truly yours,

BROADRIDGE INVESTOR
COMMUNICATION SOLUTIONS, INC.

By: _____
Name: Lyell Dampeer
Title: President, ICS-US

Cc:
Henry I. Pass, Esq.
Law Offices of Henry I. Pass
401 E. City Avenue, Suite 600A
Bala Cynwyd, PA  19004

Document No: 38398

**Exhibit 2**

## GUARANTEE AGREEMENT

This GUARANTEE AGREEMENT, dated as of March 8, 2010 ("Guarantee"), is made by BROADRIDGE FINANCIAL SOLUTIONS, INC., a Delaware corporation ("Guarantor"), to and for the benefit of JONATHAN MILLER and CHRISTINA MILLER ("Beneficiaries"). This Guarantee is made on behalf of BROADRIDGE OUTPUT SOLUTIONS, INC. ("BOS"), which is a wholly-owned subsidiary of Guarantor.

### RECITALS

WHEREAS, pursuant to that certain Stock Purchase Agreement dated March 8, 2010 between BOS and Beneficiaries ("SPA"), Beneficiaries have agreed to sell and BOS has agreed to purchase all of Beneficiaries' stock in StockTrans, Inc.;

WHEREAS, Section 3.1(c) of the SPA requires that Guarantor guaranty all of BOS' obligations under the SPA, including, without limitation, BOS' obligation to make the payment as described in Section 2.5 of the SPA; and

WHEREAS, BOS is a wholly-owned subsidiary of Guarantor, and Guarantor will receive substantial benefits from the agreements made by and between Beneficiaries and BOS as set forth in the SPA; and

WHEREAS, Guarantor has agreed to, among other things, guarantee payment and performance in full of the Guaranteed Obligations (as hereinafter defined) as set forth in this Guarantee.

NOW, THEREFORE, in consideration of the promises contained herein, and to induce Beneficiaries to enter into the SPA, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, Guarantor, intending to be legally bound, hereby agrees with Beneficiaries as follows:

### ARTICLE I.
### DEFINITIONS

1.1   Defined Terms. The following terms when used in this Guarantee, including its preamble and recitals, shall have the following meanings:

"Affiliate" means, when used with respect to a specified entity, another entity that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the entity specified.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of an entity, whether through the ownership or control of voting securities, partnership interests or other equity interests, by contract, or otherwise, and "Controlling" and "Controlled" shall have meanings correlative thereto.

"Guaranteed Obligations" means and includes all obligations and liabilities, howsoever arising, owed by BOS to Beneficiaries of every kind and description (whether or not for the payment of money), direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, pursuant to the terms of the SPA.

"Guarantor" has the meaning given in the preamble to this Guarantee.

ARTICLE II.
GUARANTEE

2.1    Guarantee.

(a)    Guarantor, as primary obligor and not merely as surety, hereby unconditionally and irrevocably guarantees to Beneficiaries the prompt payment in full and the prompt performance in full of the Guaranteed Obligations.

(b)    Guarantor agrees that if for any reason BOS shall fail to pay or perform, as the case may be, when due any of the Guaranteed Obligations, Guarantor shall promptly pay or perform, as the case may be, the same forthwith on the date such payment or performance of such Guaranteed Obligation is due or required, without regard to any exercise or non-exercise by Guarantor, BOS, or Beneficiaries of any right, remedy, power or privilege under or in respect of the SPA, and that in the case of any extension of time of the payment, performance, or renewal of any of the Guaranteed Obligations, the same will be promptly paid or performed, as the case may be, in full when due in accordance with the terms of such extension or renewal.

2.2    Obligations Absolute and Unconditional.

(a)    The obligations of Guarantor hereunder are primary obligations of Guarantor and constitute an absolute, unconditional, continuing and irrevocable guarantee of payment and performance of the Guaranteed Obligations and the other obligations of Guarantor hereunder and not of collectability, and are in no way conditioned on or contingent upon any attempt to enforce in whole or in part BOS' liabilities and obligations to Beneficiaries. Each failure by Guarantor to pay or perform, as the case may be, a Guaranteed Obligation or any other obligation hereunder shall give rise to a separate cause of action hereunder, and separate suits may be brought hereunder as each cause of action arises.

(b)    Beneficiaries may, at any time and from time to time (whether or not after revocation or termination of this Guarantee) without the consent of or notice to Guarantor, except such notice as may be required by the SPA or applicable law which cannot be waived, without incurring responsibility to Guarantor, without impairing or releasing the obligations of Guarantor hereunder, upon or without any terms or conditions and in whole or in part:

(i)    change the manner, place and terms of payment or performance of, or renew or alter, any Guaranteed Obligation or any obligations and liabilities (including any of those hereunder) incurred directly or indirectly in respect thereof or hereof, or in any manner modify, amend or supplement the terms of the SPA or any documents, instruments or agreements executed in connection therewith, in each case with the written consent of BOS (in each case, as and to the extent required by the SPA), and the agreements and guarantees

-2-

herein made shall apply to the Guaranteed Obligations or such other obligations as changed, extended, renewed, modified, amended, supplemented or altered in any manner;

        (ii)     exercise or refrain from exercising any rights against BOS or others (including Guarantor) or otherwise act or refrain from acting;

        (iii)    add or release any other guarantor from its obligations without affecting or impairing the obligations of Guarantor hereunder;

        (iv)    settle or compromise any Guaranteed Obligations or any obligations and liabilities incurred directly or indirectly in respect thereof;

        (v)     consent to or waive any breach of, or any act, omission or default under, the SPA or otherwise amend, modify or supplement (with the consent of BOS, as and to the extent required by the SPA) the SPA or any of such other instruments or agreements; and/or

        (vi)    act or fail to act in any manner referred to in this Guarantee which may deprive Guarantor of its right to subrogation against BOS to recover full indemnity for any payments or performances made pursuant to this Guarantee or of its right of contribution against any other party.

        (c)     This is a continuing Guarantee and all obligations to which it applies or may apply under the terms hereof shall be conclusively presumed to have been created in reliance hereon.

## ARTICLE III.
## REPRESENTATIONS AND WARRANTIES

    3.1    <u>Guarantor Representations and Warranties</u>. Guarantor represents and warrants to and in favor of Beneficiaries, as of the date of this Guarantee, that:

        3.1.1    <u>Existence</u>. Guarantor is duly organized and validly existing under the laws of the jurisdiction of its incorporation and is qualified to do business in such jurisdiction and in each other jurisdiction in which the conduct of its business requires such qualification.

        3.1.2    <u>Power and Authorization</u>. Guarantor has full power and authority to enter into and execute this Guarantee. This Guarantee has been duly authorized, executed and delivered by Guarantor.

        3.1.3    <u>No Conflict</u>. The execution, delivery and performance by Guarantor of this Guarantee and the execution, delivery, and performance by BOS of the SPA do not and will not (a) violate any provision of (i) any legal requirement applicable to Guarantor, (ii) the organizational and other corporate governance documents of Guarantor or (iii) any order, judgment or decree of any court or agency or governmental instrumentality binding on Guarantor, (b) conflict with, result in a breach of, or constitute a default under any material contractual obligation of Guarantor, (c) result in or require the creation or imposition of any lien upon any of the properties or assets of Guarantor, or (d) require any approval or consent of any person or entity, except for such approvals or consents which will be obtained on or before the date of this Guarantee and which have been disclosed in writing to Beneficiaries.

3.1.4   <u>Enforceable Obligations.</u> This Guarantee constitutes a legal, valid and binding obligation of Guarantor, enforceable in accordance with its terms, except to the extent that enforceability may be limited by applicable bankruptcy, insolvency, moratorium, reorganization or other similar laws affecting the enforcement of creditors' rights generally.

3.1.5   <u>Compliance with Law.</u>  Guarantor (i) is not in violation of any applicable legal requirements in any material respect and (ii) is not subject to or in default in any material respect with respect to any final judgments, writs, injunctions, decrees, rules or regulations of any court or any federal, state, municipal or other governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, in the case of either (i) or (ii) which would have a material adverse effect on the ability of Guarantor to perform its obligations under this Guarantee.

3.1.6   <u>Relationship to BOS.</u> Guarantor is the parent corporation of BOS.

3.1.7   <u>No Bankruptcy Filing.</u> Guarantor is not contemplating either the filing of a <u>petition</u> by it under any state or federal bankruptcy or insolvency laws or the liquidation of all or a major portion of its assets or property, and Guarantor has no knowledge of any person contemplating the filing of any such petition against it.

ARTICLE IV.
<u>COVENANTS</u>

Guarantor hereby covenants and agrees for the benefit of Beneficiaries, until this Guarantee is terminated pursuant to Section 6.15, as follows:

4.1   <u>Maintenance of Corporate Existence.</u> Guarantor shall maintain and preserve its existence and all material rights, privileges and franchises necessary in the normal conduct of its business. Guarantor shall notify Beneficiaries in writing within 60 days after any change in its name or place of business or chief executive office, or change in its type of organization or jurisdiction of organization.

4.2   <u>Compliance with Laws.</u> Guarantor shall promptly comply, or cause compliance, in all material respects with all legal requirements to the extent any noncompliance with such legal requirements could have a material adverse effect on the ability of Guarantor to perform and discharge its obligations under this Guarantee.

4.3   <u>Notice of Bankruptcy or Insolvency, Etc.</u> Guarantor shall notify Beneficiaries within 10 days after the occurrence of any of the following: filing by the Guarantor of a petition seeking to take advantage of any laws relating to bankruptcy, insolvency, reorganization, winding up or composition or adjustment of debts; Guarantor's consent to (or failure to contest in a timely manner) any petition filed against it in an involuntary case under such bankruptcy or other laws; Guarantor's application for (or consent to or failure to contest in a timely manner) the appointment of, or the taking of possession by, a receiver, custodian, trustee, liquidator, or the like of itself or of all or a substantial part of its assets; Guarantor's making a general assignment for the benefit of creditors; or Guarantor's taking any corporate action for the purpose of effecting any of the foregoing

-4-

ARTICLE V.
SUBROGRATION; ETC.

5.1    Waiver. Guarantor hereby unconditionally and irrevocably waives and relinquishes, to the maximum extent permitted by applicable legal requirements, all rights and remedies accorded to sureties or guarantors and agrees not to assert or take advantage of any such rights or remedies, including:

(a)    any right to require Beneficiaries to proceed against BOS or any other person or to pursue any other remedy in Beneficiaries' power before proceeding against Guarantor;

(b)    any defense that may arise by reason of the incapacity, lack of power or authority, dissolution, merger, or termination of Guarantor, BOS, or any other person or the failure of Beneficiaries to file or enforce a claim against the estate (in administration, bankruptcy or any other proceeding) of Guarantor or BOS, or any other person;

(c)    promptness, diligence, demand, presentment, protest and notice of any kind, including notice of the existence, creation or incurring of any new or additional indebtedness or obligation or of any action or non-action on the part of BOS or Beneficiaries;

(d)    any defense based upon an election of remedies by Beneficiaries, which destroys or otherwise impairs the subrogation rights of Guarantor, the right of Guarantor to proceed against BOS or another person for reimbursement, or both;

(e)    any defense based on any offset against any amounts which may be owed by any person to Guarantor for any reason whatsoever;

(f)    any defense based on any act, failure to act, delay or omission whatsoever on the part of BOS or the failure by BOS to do any act or thing or to observe or perform any covenant, condition or agreement to be observed or performed by it under the SPA;

(g)    any defense based upon any statute or rule of law which provides that the obligation of a surety must be neither larger in amount nor in other respects more burdensome than that of the principal;

(h)    any defense based on any change in the time, manner or place of any payment or performance under, or in any other term of, the SPA, or any other amendment, renewal, extension, acceleration, compromise or waiver of or any consent or departure from the terms of the SPA;

(i)    any right to assert the bankruptcy or insolvency of BOS or any other person as a defense hereunder or as the basis for rescission hereof and any defense arising because of Beneficiaries' institution of any proceeding under the Federal Bankruptcy Code; and

(j)    any other circumstance (including any statute of limitations), any act or omission by BOS, or any existence of or reliance on any representation by BOS or Beneficiaries that might otherwise constitute a defense available to, or discharge of, any guarantor or surety.

5.2    Subrogation. Until this Guarantee is terminated in accordance with Section 6.15 below, neither Guarantor nor BOS shall exercise any right of subrogation or enforce any remedy which it now may have or may hereafter have against any person in respect of the Guaranteed Obligations, whether or not such claim, right or remedy arises in equity, under contract, by statute, under common law or otherwise.

5.3     Bankruptcy.

(a) The obligations of Guarantor under this Guarantee shall not be altered, limited or affected by any proceeding, voluntary or involuntary, involving the bankruptcy, reorganization, insolvency, receivership, liquidation or arrangement of BOS or any Affiliate thereof, or by any defense which BOS or any Affiliate thereof may have by reason of any order, decree or decision of any court or administrative body resulting from any such proceeding.

(b)     Guarantor hereby irrevocably waives, to the extent it may do so under applicable legal requirements, any protection against enforcement of this Guarantee to which it may be entitled under the Federal Bankruptcy Code or equivalent provisions of the laws or regulations of any other jurisdiction with respect to any proceedings, or any successor provision of law of similar import, in the event of any bankruptcy event with respect to BOS. Specifically, in the event that the trustee (or similar official) in a bankruptcy event with respect to BOS or the debtor-in-possession takes any action (including the institution of any action, suit or other proceeding for the purpose of enforcing the rights of BOS under this Guarantee), Guarantor shall not assert any defense, claim or counterclaim denying liability hereunder on the basis that this Guarantee or the SPA is an executory contract or a "financial accommodation" that cannot be assumed, assigned or enforced or on any other theory directly or indirectly based on the Federal Bankruptcy Code, or equivalent provisions of the law or regulations of any other jurisdiction with respect to any proceedings or any successor provision of law of similar import. If a bankruptcy event with respect to BOS shall occur, Guarantor agrees, after the occurrence of such bankruptcy event, to reconfirm in writing, to the extent permitted by applicable legal requirements and at Beneficiaries 's written request, its pre-petition waiver of any protection to which it may be entitled under the Federal Bankruptcy Code or equivalent provisions of the laws or regulations of any other jurisdiction with respect to proceedings and, to give effect to such waiver, Guarantor consents to the assumption and enforcement of each provision of this Guarantee by the debtor-in-possession or BOS' trustee in bankruptcy, as the case may be.

5.4     Reinstatement. This Guarantee and the obligations of Guarantor hereunder shall continue to be effective or be automatically reinstated, as the case may be, if and to the extent that for any reason any payment or performance by or on behalf of Guarantor in respect of the Guaranteed Obligations is rescinded or otherwise restored to Guarantor or BOS, whether as a result of any proceedings in bankruptcy or reorganization or otherwise, all as if such payment or performance had not been made, and Guarantor agrees that it will indemnify Beneficiaries  on demand for all reasonable costs and expenses (including reasonable fees of counsel) incurred by Beneficiaries  in connection with any such rescission or restoration.


ARTICLE VI.
MISCELLANEOUS

6.1     Obligations Secured. Without limiting the generality of the foregoing, this Guarantee secures the payment and performance when due of all Guaranteed Obligations. If, notwithstanding the representation and warranty set forth in Section 3.1.4 or anything to the contrary herein, enforcement of the liability of Guarantor under this Guarantee for the full amount of the Guaranteed Obligations would be an unlawful or voidable transfer under any applicable fraudulent conveyance or fraudulent transfer law or any comparable law, then the liability of Guarantor hereunder shall be

-6-

reduced to the highest amount for which such liability may then be enforced without giving rise to an unlawful or voidable transfer under any such law.

6.2    Binding Effect. This Guarantee is binding upon Guarantor and its successors and assigns. Guarantor may not assign any of its obligations hereunder without the prior written consent of Beneficiaries (and any purported assignment in violation of this Section shall be void).

6.3    Other Waivers. No delay or omission on the part of Beneficiaries in exercising any of its rights (including those hereunder) and no partial or single exercise thereof and no action or non-action by Beneficiaries , with or without notice to Guarantor, BOS, or any other person, shall constitute a waiver of any rights or shall affect or impair this Guarantee.

6.4    Headings. The headings in this Guarantee are for convenience of reference only and shall not constitute a part of this Guarantee for any other purpose or be given any substantive effect.

6.5    Remedies Cumulative. Each and every right and remedy of Beneficiaries hereunder shall be cumulative and shall be in addition to any other right or remedy given hereunder or under the SPA, or now or hereafter existing at law or in equity.

6.6    Severability. Any provision of this Guarantee that may be determined by competent authority to be prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

6.7    Amendments. This Guarantee may be amended, waived or otherwise modified only with the written consent of Guarantor and Beneficiaries and otherwise in accordance with the terms of the SPA.

6.8    Governing Law. This Guarantee and the rights and obligations of Beneficiaries and Guarantor shall be governed by, and construed in accordance with, the law of the Commonwealth of Pennsylvania without reference to principles of conflicts of law.

6.10    Integration of Terms. This Guarantee is intended by the parties as a final expression of their agreement and is intended as a complete and exclusive statement of the terms and conditions thereof.

6.11    Notices. Any communications between the parties hereto or notices provided herein to be given may be given to the following addresses:


If to Guarantor:          Broadridge Financial Solutions, Inc.
                          2 Journal Square Plaza
                          Jersey City, New Jersey 07306
                          Attention: General Counsel
                          Telephone: 1.201.714.3505
                          Facsimile: 1.201.714.3506

With a copy to:

-7-

                    Squire, Sanders & Dempsey L.L.P.
                    4900 Key Tower
                    127 Public Square
                    Cleveland, OH 44114-1304
                    Attention: Cipriano S. Beredo, Esq. and
                              Daniel G. Berick, Esq.
                    Telephone: 1.216.479.8500
                    Facsimile: 1.216.479.8780

If to Beneficiaries      Jonathan and Christina Miller
                    10 Cambridge Road
                    Haverford, PA 19041
                    Telephone: 1.610.359.5870
                    Facsimile: 1.610.642.6135

With a copy to:
                    Law Offices of Henry Ian Pass
                    401 E. City Avenue, Suite 600A
                    Bala Cynwyd, PA 19004
                    Attention: Henry I. Pass, Esq.
                    Telephone: 1.610.660.8001
                    Facsimile: 1.610.660.8004

All notices or other communications required or permitted to be given hereunder shall be in writing and shall be considered as properly given (a) if delivered in person, (b) if sent by overnight delivery service (including Federal Express, UPS and other similar overnight delivery services), (c) if mailed by first class United States Mail, postage prepaid, registered or certified with return receipt requested, (d) if sent by facsimile or (e) if sent via other electronic means (including electronic mail). Notice so given shall be effective upon receipt by the addressee, except that communication or notice so transmitted by facsimile or other direct written electronic means shall be deemed to have been validly and effectively given on the day on which it is transmitted if transmitted before 4:00 p.m., recipient's time, and if transmitted after that time, on the next following business day; provided, however, that (i) if any notice is tendered to an addressee and the delivery thereof is refused by such addressee, such notice shall be effective upon such tender, and (ii) with respect to any notice given via facsimile or other electronic means, the sender of such message shall promptly provide the addressee with an original copy of such notice by any of the means specified in clauses (a), (b) or (c) above. Any party shall have the right to change its address for notice hereunder to any other location within the continental United States by giving five days' notice to the other parties in the manner set forth above.

6.12    Counterparts. This Guarantee and any amendments, waivers, consents or supplements hereto or in connection herewith may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed an original, but all such counterparts together shall constitute one and the same agreement.

6.13    Time. Time is of the essence of this Guarantee.

6.14   <u>Termination</u>. Subject to Section 5.4, this Guarantee and all of the obligations of Guarantor hereunder shall terminate upon the payment and performance in full of all Guaranteed Obligations in accordance with the SPA. Unless earlier terminated pursuant to the foregoing sentence, this Guarantee shall survive any legal proceedings instituted, commenced, or completed against BOS.

6.15   <u>SPA</u>. Guarantor acknowledges that it has been provided with a copy of the SPA and has read and is familiar with the provisions of the SPA.

IN WITNESS WHEREOF, Guarantor, intending to be legally bound, has caused this Guarantee to be duly executed and delivered as of the date first above written.

BROADRIDGE FINANCIAL SOLUTIONS, INC.

By: _____

Name: Adam D. Amsterdam
Title: Vice President, General Counsel, and Secretary
Date:

*[Signature Page to Guarantee]*