# EXHIBIT A

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
CIVIL ACTION NO. 2:15-cv-00405-JD

- - - - - - - - - - - - - - - - - - - - - - - -

PARAMOUNT FINANCIAL COMMUNICATIONS, INC.    :
d/b/a PLAN MANAGEMENT CORP. and JONATHAN    :
MILLER,                                     :
                                            :
                                 Plaintiffs,:
          v.                                :
                                            :
BROADRIDGE INVESTOR COMMUNICATION SOLUTIONS,:
INC.,                                       :
                                            :
                                  Defendant.:

- - - - - - - - - - - - - - - - - - - - - - - -

- - -

WEDNESDAY, JANUARY 13, 2016

- - -

Oral deposition of MARK KOPELMAN taken pursuant to notice, held at DRINKER, BIDDLE & REATH, LLP, One Logan Square, Suite 2000, 18th & Cherry Streets, Philadelphia, Pennsylvania, 19103, commencing at 9:17 a.m. before Shauna L. Detty, Court Reporter - Notary Public there being present.

- - -

KAPLAN, LEAMAN AND WOLFE
Registered Professional Reporters
Constitution Place, Suite 909
325 Chestnut Street
Philadelphia, PA 19106

Page 2

```
 1   A P P E A R A N C E S:
 2      LAW OFFICES OF HENRY IAN PASS
        BY:      HENRY IAN PASS, ESQUIRE
 3               3 Bala Plaza, East, Suite 700A
                 Bala Cynwyd, Pennsylvania 19004
 4               (610) 660-8001
                 Representing the Plaintiffs
 5
 6      DRINKER, BIDDLE & REATH, LLP
        BY:      MICHAEL O. ADELMAN, ESQUIRE
 7               600 Campus Drive
                 Florham Park, New Jersey 07932
 8               (973) 549-7000
                 Representing the Defendant
 9
10      DRINK BIDDLE & REATH, LLP
        BY:      CHANDA A. MILLER, ESQUIRE
11               One Logan Square, Suite 2000
                 18th & Cherry Streets
12               Philadelphia, Pennsylvania 19103
                 (215) 988-2700
13               Representing the Defendant
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 193

1  have been marked as Exhibit Kopelman-13 for
2  identification.)
3       - - -
4  BY MR. PASS:
5  **Q.    Mr. Kopelman, I provided you with a**
6  **document which I can advise you is a draft, one of**
7  **many, of the document that was ultimately signed**
8  **under the title of "Marketing Agreement." This one**
9  **is labeled, "Miller Revised Draft, February 2nd,**
10 **2010," bearing Bate stamp 579 through 593, produced**
11 **by Broadridge in response to the plaintiffs'**
12 **request for documents.**
13         **Let me know when you're ready to**
14 **answer questions about it and its history.**
15 A.    I am ready, I think.
16 **Q.    In the course of your discussions with**
17 **Mr. Miller, could you please tell me, to the best**
18 **of your ability, when the concept of a marketing or**
19 **referral arrangement came up regarding Broadridge**
20 **and Plan Management?**
21 A.    I don't know the exact sequence.  I
22 recall after the Indication of Interest, that there
23 was a discussion -- there was discussion, not a
24 discussion.  I don't remember the details of it,
25 but the feedback from Jonathan was the value that

Page 194

1  we're assigning to Plan Management was
2  insignificant.  And we then shifted focus; in that,
3  Plan Management was never for sale and it's not for
4  sale now and, kind of, Plan Management's off the
5  table.
6         I believe in a -- at a minimum, at a
7  dinner we had at Flemming Steakhouse, Villanova,
8  kind of, whatever, West of Ardmore, somewhere out
9  there on the Main Line, that we came to some
10 agreement regarding what we would pay for
11 StockTrans and an agreement in principle that if we
12 could figure out how to support the growth of his
13 business, which became office space and shared
14 resources and the eventual hiring of resources that
15 he wanted and wanted to work for him and some joint
16 marketing, that that was kind of the structure of
17 the deal.  And I want to say that may have been
18 mid-September/late September of 2009.
19 **Q.    Okay.**
20 A.    I don't know if it came up before then,
21 but that's, in my recollection, where maybe it
22 seemed the most concrete.
23 **Q.    And I believe you testified earlier that**
24 **you were involved with the negotiation of the**
25 **business points in the stock purchase agreement; is**

Page 195

1  **that correct?**
2  A.    Yes.
3  **Q.    Were you also involved with the**
4  **negotiation of the business points in the marketing**
5  **agreement that brings us here today?**
6  A.    Yes.
7  **Q.    Okay.  And do you recall the document**
8  **first being called a "referral agreement"?**
9  A.    I'm aware that the terminology changed,
10 but I don't remember why it did.
11 **Q.    And did Jon Miller ever convey or**
12 **communicate to you why he would only sell**
13 **StockTrans to Broadridge on the condition that**
14 **there be a referral arrangement between Plan**
15 **Management and Broadridge?**
16        MR. ADELMAN:  Object to the form of
17 the question; assumes facts not in evidence.
18        THE WITNESS:  Well, I also want to
19 go back to your earlier question and one of my
20 responses where I don't believe that that was
21 communicated in that context.  I do believe that
22 this agreement and most everything else that we
23 negotiated right up to --
24        MR. ADELMAN:  "This agreement" being
25 the one --

Page 196

1         THE WITNESS:  I'm sorry, the
2  marketing agreement.
3         And all the other agreements and
4  every dimension of the stock purchase agreement
5  were negotiated right up to close on March 8th,
6  2010, and I believe all those were important.  I
7  don't know that one was more so than the other.
8  BY MR. PASS:
9  **Q.    All right.  And --**
10        MR. ADELMAN:  Were you finished with
11 your answer?
12        THE WITNESS:  No.
13 BY MR. PASS:
14 **Q.    I apologize.**
15 A.    So your question was first premised by
16 that, which I didn't say that earlier.  What was
17 the second half of your question?
18 **Q.    I don't think there was a second half.**
19 **I'm about to get to another question.**
20 A.    Okay.
21 **Q.    And I was about to say before I actually**
22 **focus on the market agreement draft, which was**
23 **Number 13, let's add an Exhibit 14.**
24        - - -
25        (Whereupon, Bates #s BCIS6406-6412

Page 197

1  have been marked as Exhibit Kopelman-14 for
2  identification.)
3         - - -
4  BY MR. PASS:
5  Q.    I can streamline this line of
6  questioning. Although the exhibit is comprised of
7  Pages 6406 through 6412, I'd like to focus on Page
8  6411. And, specifically, I'm referring to an
9  e-mail that I sent to Cip Beredo, B-E-R-E-D-O.
10        MS. MILLER: C-I-P, the first name.
11 BY MR. PASS:
12 Q.    He was referred to as Cip and that's how
13 I'll refer to him here. His full name is Cipriano,
14 C-I-P-R-I-A-N-O.
15        And in the second paragraph of my
16 e-mail, I advised Cip as follows: "As Broadridge
17 has been aware from the start, Jon and Christina's
18 ability to grow Plan Management through the
19 synergies, cross selling and other partnership
20 strategies that Broadridge brings to the table has
21 always been a mission critical driver of their
22 decision to sell StockTrans to Broadridge in the
23 first instance. And the possibility of Broadridge
24 not only exiting the partnership, but competing
25 with exponentially more resources is fraught with

Page 198

1  apprehension and the material adverse impact on the
2  Millers and Plan Management should be
3  self-evident."
4         And then I go on to say, "If
5  Broadridge is adamant about maintaining its ability
6  to enter this space either directly or indirectly,
7  then we must arrive at an economic situation that
8  compensates Plan Management for the lost revenue
9  process and value that would be at stake." And
10 then I propose a formula for that.
11        Now, the purpose of my calling your
12 attention to this e-mail was as a result of your
13 advising us that you were not aware of the
14 importance that was being placed on the marketing
15 relationship between Broadridge and PMC to Jon and
16 Christina Miller and that the market entering into
17 that referral or marketing relationship was a
18 condition preceding to the purchase.
19        And I guess with all that said, I
20 have a very simple question for you. Prior to
21 today, had you ever seen the e-mail that I sent to
22 Cip Beredo on February 28th, 2010?
23        MR. ADELMAN: Objection to form, and
24 it also mischaracterizes the witness' testimony.
25        You can answer the question.

Page 199

1         THE WITNESS: You did
2  mischaracterize what I said. I didn't say that I
3  never heard it's important to them. But on any
4  given day, there were many things that were
5  important to them. And you simply stating in an
6  e-mail on a given day doesn't make it true.
7         On any given day, whether it was
8  resolving what to do with Jonathan's Buick or how
9  to account for the difference in heart medication
10 or other subtle differences in benefits or the
11 number of hours that people could work or who could
12 answer the phone, whether Christina had to sign in
13 at the front desk or not as a Plan Management
14 employee but not a Broadridge employee, on any
15 given day, those issues would have been addressed
16 with the same certainty and color that, as an
17 advisor to Jonathan, that you brought to a deal.
18        So I believe I've seen this and that
19 I was copied on it, but, again, the context, to me,
20 in reading this is that was the point you were
21 making on that day and those points continue to
22 change.
23 BY MR. PASS:
24 Q.    Besides your having seen it, who else at
25 Broadridge, to your knowledge, either saw the

Page 200

1  e-mail or was familiar with it?
2         MR. ADELMAN: When?
3         MR. PASS: At any time after
4  February 28th, 2010, through March 8th, 2010.
5         THE WITNESS: The best source of
6  that would -- just to refer to the cc list and
7  assuming e-mail was delivered as intended -- that
8  Vince Roux and Steve Glantz would have seen it,
9  including myself having been copied on it.
10 BY MR. PASS:
11 Q.    To your recollection, did you forward it
12 to anyone else who's not otherwise on the list that
13 received copies when I sent it?
14 A.    I don't know if I did or didn't.
15 Q.    Okay. Getting back to Exhibit 13 --
16 A.    Okay.
17 Q.    -- I was hoping you could enlighten me as
18 to the author of certain comments that appear in
19 this version of the marketing agreement.
20        And, specifically, I'd like to start
21 on Page 4, Subsection Roman numeral V titled,
22 "Term." And the language that I'm referring to is
23 the insertion in all capital letters that says,
24 "Agreed, would prefer a shorter term. Need
25 rationale. Clearly want to see results from