IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

```
PARAMOUNT FINANCIAL          :    CIVIL ACTION
COMMUNICATIONS, INC., et al., :
                             :    NO. 15-405
         Plaintiffs          :
      v.                     :
                             :
BROADRIDGE INVESTOR          :
COMMUNICATIONS SOLUTIONS, INC.:
                             :
         Defendant.          :
```

M E M O R A N D U M

EDUARDO C. ROBRENO, J.                        JULY 26, 2023

### CONTENTS

I.   Introduction ............................................. 2
II.  Factual Background ....................................... 4
III. Motions as to Liability ................................. 8
  A.  Broadridge's Motion for Judgment as a Matter of Law ..... 8
  1.  Legal Standard ........................................ 8
  2.  Analysis ............................................. 11
  B.  Motion for a New Trial ............................... 29
  1.  Legal Standard ....................................... 30
  2.  Broadridge's Motion for New Trial .................... 31
  3.  Plaintiff Jonathan Miller's Motion for New Trial ...... 36
IV.  Motions as to Damages ................................... 40
  A.  Motion to Strike Expert Report ....................... 41
  1.  Legal Standard ....................................... 43
  2.  Analysis ............................................. 45
  B.  Broadridge's Motion for Judgment as a Matter of Law as to
  Damages or in the Alternative for a New Trial .............. 53
  C.  Broadridge's Motion to Amend the Judgment ............. 56
  D.  Plan Management's Motion to Award Interest ............ 58
V.   Stay of Execution ....................................... 59
VI.  Conclusion .............................................. 59

## I.   INTRODUCTION

Paramount Financial Communications (d/b/a Plan Management) and Jonathan Miller (collectively, "Plaintiffs") brought this action against Broadridge Investor Communications Solutions, Inc. ("Broadridge") for fraudulent inducement and breach of contract. A nine-day jury trial was held. Following the close of Plaintiffs' case, Broadridge moved for judgment as a matter of law. The Court granted the motion as to Jonathan Miller's claim for fraudulent inducement, but denied the motion as to Plan Management's breach of contract claim. After the close of all the evidence, Broadridge again moved for judgment as a matter of law. The Court took the motion under advisement and charged the jury. The jury returned a verdict in favor of Plan Management, finding that Broadridge acted with willful misconduct and gross negligence in its breach of the contract.[1] Following a short

---

[1] Ordinarily, in a contract action, there is no jury question as to gross negligence or willful misconduct. Such standards are related to tort actions, where intent is at issue. See, e.g., Pittsburgh, Cincinnati & St. Louis Ry. Co. v. Lyon, 16 A. 607, 609 (Pa. 1889) (In actions in contract . . . the amount recoverable is limited to the actual damages caused by the breach; the measure being the same whether the defendant fails to comply with his contract through inability, or willfully refuses to perform it. But in torts the rule is different; the motive of the defendant becomes material."); John B. Conomos, Inc. v. Sun Co., Inc., 831 A.2d 696, 707 n.6 (Pa. Super. Ct. 2003) ("[T]he motivation itself for Sun's breach is not controlling in causes of action under contract law."). Here, however, the parties agreed in their contract that a heightened standard of care would be applicable to the determination of damages in the event of breach.

damages phase of trial, the jury awarded Plan Management $25,000,000 in compensatory damages for breach of contract.

Before the Court are several post-trial motions by all parties to the case. Plaintiff Jonathan Miller has moved for a new trial as to his fraudulent inducement claim. Plaintiff Plan Management has moved to alter the judgment to award post-judgment interest. Broadridge has moved for judgment as a matter of law as to both liability and damages and seeks a stay of execution of the judgment. In addition, Broadridge has moved to strike the expert report of Michael Molder.[2]

---

[2] The parties initially filed these motions before the trial transcripts were finalized. By stipulation, the parties then had an opportunity to amend their briefing in the event the final trial transcripts differed from the daily transcripts obtained during the course of trial. The final versions of the motions were docketed as follows:

1. Def's Renewed Mot for J. as a Matter of Law (ECF No. 256) and Pls.' Opp'n (ECF No. 249)
2. Def's Mot. for J. as a Matter of Law as to Damages (ECF No. 257) and Pls.' Opp'n (ECF No. 250)
3. Def's Mot to Strike Expert Materials (ECF No. 255) and Pls.' Opp'n (ECF No. 268)
4. Def's Mot. for New Trial or to Amend J. (ECF No. 258), Pls.' Opp'n (ECF No. 269), and Def's Reply (ECF No. 259)
5. Pl. Jonathan Miller's Mot. for New Trial (ECF No. 266), Def's Resp. in Opp'n (ECF No. 251), and Pl.'s Reply (ECF No. 267)
6. Def's Mot. to Stay Execution (ECF No. 246) and Pls.' Resp. (ECF No. 252)
7. Pl.'s Mot. to award Post-J. Interest (ECF No. 227) and Def's Resp. (ECF No. 234).

## II.  FACTUAL BACKGROUND

Plaintiffs and Broadridge entered into seven agreements on March 8, 2010. Two of those agreements are relevant to this case: the Stock Purchase Agreement of one of Mr. Miller's companies, StockTrans, Inc., and the Marketing Agreement. The Stock Purchase Agreement provided, in part, that Mr. Miller would sell StockTrans to Broadridge, and Broadridge would perform the Marketing Agreement by referring clients to one of Mr. Miller's businesses, Plan Management.

The Marketing Agreement commenced on March 8, 2010 and ran for an initial Term of five (5) years. Under the Agreement,

> By the date that is twelve (12) months from the Effective Date, Broadridge will use commercially reasonable efforts to refer at least 200 Viable Clients to Plan Management, (as adjusted, the "**Referral Target**"). During each twelve (12) month period thereafter during the Term, Broadridge will use commercially reasonable efforts to refer such number of Viable Clients as equals or exceeds the Referral Target applicable to the previous twelve month period multiplied by one hundred and ten (110%) percent. As used here in, a "**Viable Client**" is a corporate issuer that has any type of securities or securities-related incentive plan or that expresses an interest in implementing such a plan and expresses to Plan Management or Broadridge an interest in learning about Plan Management's services and which observes a demonstration of Plan Management's Option Trax® system.

Plan Management would then pay Broadridge a $1,000.00 referral fee for each client referred by Broadridge and closed by Plan Management. The Marketing Agreement could be terminated during the initial term if a material breach went uncured for sixty

days after the nonbreaching party provided notice, or upon

mutual consent of the parties.

The Marketing Agreement also included a limitation of

liability clause. This provision stated, in relevant part:

> Notwithstanding anything else in this Agreement to the
> contrary, in the absence of a party's gross negligence
> or willful misconduct, the aggregate liability of any
> party in connection with any breach of this Agreement
> shall be limited to the amount of fees paid or payable
> to Broadridge by Plan Management during the twelve month
> period preceding the date of such breach. EXCEPT WITH
> RESPECT TO . . . EITHER PARTY'S GROSS NEGLIGENCE OR
> WILLFUL MISCONDUCT, IN NO EVENT WILL EITHER PARTY BE
> RESPONSIBLE FOR SPECIAL, INDIRECT, INCIDENTAL OR
> CONSEQUENTIAL DAMAGES WHICH THE OTHER PARTY MAY INCUR OR
> EXPERIENCE ON ACCOUNT OF ENTERING INTO OR RELYING ON
> THIS AGREEMENT (INCLUDING LOST PROFITS OR LOST SAVINGS),
> EVEN IF FORESEEABLE OR EVEN IF SUCH PARTY HAS BEEN
> ADVISED OF THE POSSIBILITY OF SUCH DAMAGES . . . .

The Marketing Agreement was fully integrated.

Plan Management received only a few referrals from

Broadridge in the initial year of the Marketing Agreement. In

that first year--and in subsequent years--Mr. Miller and other

Plan Management representatives reached out to Broadridge

representatives, asking for more referrals. Plan Management also

created a referral form in 2011 to help facilitate referrals by

Broadridge salespeople.

Plan Management ultimately sent a notice of breach to

Broadridge in the summer of 2014, after having received only a

small fraction of the expected referrals, approximately four

years into the contract. Plan Management and Mr. Miller then

brought this suit in 2015, alleging breach of contract (Count I), fraudulent inducement (Count II), constructive/equitable fraud (Count III), and negligent misrepresentation (Count IV). Broadridge filed a partial motion to dismiss, and the Court granted the motion in part, dismissing the claims in Count II as they pertained to the Marketing Agreement, and dismissing Counts III and IV entirely. See Paramount Fin. Commc'ns, Inc. v. Broadridge Inv. Commc'n Sols., Inc., No. 15-405, No. 2015 WL 4093932 (E.D. Pa. July 7, 2015) (DuBois, J.).

Following a lengthy and contentious discovery period, Broadridge filed a motion to exclude Plan Management's expert reports and a motion for summary judgment. Plan Management had proffered two damages experts to estimate lost profits, Joseph Potenza and Michael Molder. The Court granted in part and denied in part Broadridge's motion to exclude the expert reports, finding that Mr. Potenza's report must be excluded because it was not reliable, and in turn excluding those portions of Mr. Molder's report that relied on Mr. Potenza's report. Mr. Molder's calculation that relied on internal data provided by Plan Management was found sufficiently reliable, and could be admissible at trial so long as the factual assumptions of the calculation had a reasonable basis in the trial record. See Paramount Fin. Commc'ns, Inc. v. Broadridge Inv. Commc'n Sols.,

Inc., No. 15-405, 2018 WL 7815202 (E.D. Pa. Dec. 13, 2018)
(DuBois, J.)

The Court subsequently denied Broadridge's motion for
summary judgment, reasoning that a genuine dispute of material
fact existed as to (1) the meaning of commercially reasonable
efforts; (2) the number of clients required to be referred over
the term of the contract; (3) whether or not Broadridge breached
the contract, in light of the meaning of the disputed
contractual terms; (4) whether or not Broadridge acted with
gross negligence or willful misconduct; (5) when Mr. Miller was
on inquiry notice of a potential fraud claim; and (6) whether
Broadridge fraudulently induced Mr. Miller into signing the
Stock Purchase Agreement. See Paramount Fin. Commc'ns, Inc. v.
Broadridge Inv. Commc'n Sols., Inc., No. 15-405, 2019 WL 3022346
(E.D. Pa. May 23, 2019) (DuBois, J.).

The case then proceeded to trial. Mr. Miller argued that he
was fraudulently induced into signing the Stock Purchase
Agreement by Broadridge's representations in the Marketing
Agreement. Plan Management contended that Broadridge breached
the Marketing Agreement with gross negligence and or willful
misconduct, entitling it to special, indirect, incidental, and
consequential damages. Broadridge argued that it did not
fraudulently induce Mr. Miller into signing the Stock Purchase
Agreement, and that it fulfilled its contractual obligations

7

under the Marketing Agreement. Following a nine-day trial, the jury found in favor of Plan Management as to liability--that Broadridge breached the contract and did so with gross negligence and willful misconduct.[3] After the completion of a brief damages phase of trial, the jury returned a $25,000,000.00 verdict for Plan Management.

## III. MOTIONS AS TO LIABILITY

Broadridge has moved for judgment as a matter of law, or, in the alternative, for a new trial. Mr. Miller has moved for judgment as a matter of law as to his fraudulent inducement claim. These motions will be addressed in turn.

### A.    Broadridge's Motion for Judgment as a Matter of Law[4]

#### 1.   Legal Standard

Under Federal Rule of Civil Procedure 50,

> If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may[] (A) resolve the issue against the party; and (B) grant a motion for judgment as a matter of law against the party on a claim or defense that, under controlling law, can

---

[3] At the close of Plaintiffs' case, Broadridge moved for judgment as a matter of law as to Mr. Miller's fraudulent inducement claim. The Court granted the motion. See Order, ECF No. 215.

[4] As Plaintiffs notes in response to Broadridge's renewed motion for judgment as a matter of law, their substantive response is the same as the response to Broadridge's motion for a new trial. See Resp. to Renewed Mot. for J. as a Matter of Law at 3 & n.1, ECF No. 249. Accordingly, the Court looks to Plaintiffs' response to the new trial motion for substantive argument.

be maintained or defeated only with a favorable finding
on that issue.

Fed. R. Civ. P. 50(a). "[I]n considering a motion for a directed
verdict, the court does not weigh the evidence, but draws all
factual inferences in favor of the nonmoving party." Lytle v.
Household Mfg., Inc., 494 U.S. 545, 554 (1990); see also Reeves
v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150-51 (2000)
("Credibility determinations, the weighing of the evidence, and
the drawing of legitimate inferences from the facts are jury
functions, not those of a judge. Thus, although the court should
review the record as a whole, it must disregard all evidence
favorable to the moving party that the jury is not required to
believe." (citations and quotation marks omitted)).

"If the court does not grant a motion for judgment as a
matter of law under Rule 50(a), . . . . the movant may file a
renewed motion for judgment as a matter of law . . . ." Fed. R.
Civ. P. 50(b). "[A] post-trial Rule 50 motion can only be made
on grounds specifically advanced in a motion for a directed
verdict at the end of plaintiff's case." Kars 4 Kids Inc. v. Am.
Can!, 8 F.4th 209, 220 (3d Cir. 2021) (quoting Kutner Buick,
Inc. v. Am. Motors Corp., 868 F.2d 614, 617 (3d Cir. 1989)). The
Court has the discretion to uphold the jury's verdict, order a
new trial, or direct the entry of judgment as a matter of law.
Fed. R. Civ. P. 50(b).

As with a Rule 50(a) motion, a Rule 50(b) motion should only be granted where "there is insufficient evidence from which a jury reasonably could find liability." Avaya Inc., RP v. Telecom Labs, Inc., 838 F.3d 354, 373 (3d Cir. 2016) (quoting Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1166 (3d Cir. 1993)); Jaasma v. Shell Oil Co., 412 F.3d 501, 503 (3d Cir. 2005) ("The question is not whether there is literally no evidence supporting the party against whom the motion is directed but whether there is evidence upon which the jury could properly find a verdict for that party." (quoting Wright & Miller, Fed. Prac. & Proc. § 2524 (1971))); Goodman, 293 F.3d at 665 (requiring a "legally sufficient evidentiary basis" for a verdict to stand).

"Although judgment as a matter of law should be granted sparingly, a scintilla of evidence is not enough to sustain a verdict of liability." Lightning Lube, 4 F.3d at 1166 (citing Walter v. Holiday Inns, Inc., 985 F.2d 1232, 1238 (3d Cir. 1992)); see also Galena v. Leone, 638 F.3d 186, 196 (3d Cir. 2011) (stating that a motion for judgment as a matter of law "should be granted only if, viewing the evidence in the light most favorable to the nonmoving party, there is no question of material fact for the jury and any verdict other than the one directed would be erroneous under the governing law" and that "a directed verdict is mandated where the facts and law will

10

reasonably support only one conclusion" (quoting Beck v. City of Pittsburgh, 89 F.3d 966, 971 (3d Cir. 1996) and McDermott Int'l, Inc. v. Wilander, 498 U.S. 337, 356 (1991))).

"If the court grants a renewed motion for judgment as a matter of law, it must also conditionally rule on a motion for a new trial by determining whether a new trial should be granted if the judgment is later vacated or reversed." Fed. R. Civ. P. 50(c).

2.  Analysis

The issues before the jury during the liability phase of the trial which Broadridge now contests were whether Broadridge breached the Marketing Agreement and whether it did so with gross negligence or willful misconduct. To succeed on the breach of contract claim, Plan Management was required to prove "(1) the existence of a contract, including its essential terms, (2) a breach of the contract; and, (3) resultant damages." Meyer, Darragh, Buckler, Bebenek & Eck, P.L.L.C. v. Law Firm of Malone Middleman, P.C., 137 A.3d 1247, 1258 (Pa. 2016) (citing J.F. Walker Co., Inc. v. Excalibur Oil Grp., Inc., 792 A.2d 1269, 1272 (Pa. Super. Ct. 2002)).

To succeed on its claim that Broadridge breached the Marketing Agreement with gross negligence, Plan Management was required to prove that Broadridge acted with "a want of scant care, but something less than intentional indifference to

11

consequences of acts." Fid. Leasing Corp. v. Dun & Bradstreet, Inc., 494 F. Supp. 786, 790 (E.D. Pa. 1980). Thus, "[t]o find gross negligence, there must be 'an extreme departure from ordinary care.'" Royal Indem. Co. v. Sec. Guards, Inc., 255 F. Supp. 2d 497, 505 (E.D. Pa. 2003) (quoting Douglas W. Randall, Inc. v. AFA Protective Sys., Inc., 516 F. Supp. 1122, 1126 (E.D. Pa. 1981)); cf. Bloom v. Dubois Reg'l Med. Ctr., 597 A.2d 671, 679 (Pa. Super. Ct. 1991) ("We hold that the legislature intended the term gross negligence [under the Mental Health Procedures Act] to mean a form of negligence where the facts support substantially more than ordinary carelessness, inadvertence, laxity, or indifference. The behavior of the defendant must be flagrant, grossly deviating from the ordinary standard of care.").[5] To show that Broadridge acted with willful

---

[5] The Court instructed the jury as to gross negligence as follows:

> Gross negligence is significantly worse than ordinary negligence. It is defined as "conduct more egregious than ordinary negligence but [that] does not rise to the level of intentional indifference to the consequences of one's acts." Put differently, gross negligence "may be deemed to be a lack of slight diligence or care comprising a conscious, voluntary at or omission" when a party knows they have a legal duty to act. To prove that Broadridge's conduct was grossly negligent, Plan Management must prove, by a preponderance of the evidence, that Broadridge's conduct significantly departed from how a reasonable person would have acted under the circumstances.

Day 8 Tr. at 21:15-22:1, ECF No. 243.

misconduct, on the other hand, Plan Management needed to show
that Broadridge "desired to bring about the result that
followed, or at least . . . was aware that it was substantially
certain to ensue." Evans v. Phila. Transp. Co., 212 A.2d 440,
443 (Pa. 1965).[6]

Here, although Broadridge has shown that there was
insufficient evidence for a jury to find that Broadridge acted
with willful misconduct in breaching the Marketing Agreement,
Broadridge has not shown that the evidence presented at trial
could only reasonably support a finding that Broadridge did not
breach the Marketing Agreement and did not do so with gross
negligence. Thus, Broadridge's motion for judgment as a matter
of law will be denied in part and granted in part. Given that
the Court will grant the motion for judgment as a matter of law
only as to willful misconduct but not gross negligence, and the
limitation of liability clause only applies if there is neither
gross negligence nor willful misconduct, the Court need not

---

[6] The Court instructed the jury as to willful misconduct that
    Willful misconduct means conduct whereby the actor
    desired to bring about the result that followed or at
    least was aware that it was substantially certain to
    follow, so that such desire can be implied. "Willful
    misconduct" is synonymous with intentional misconduct.
    Thus, in order to find that Broadridge engaged in willful
    misconduct, you must find that Broadridge was aware that
    its failure to use commercially reasonable efforts to
    refer viable clients would cause harm to Plan Management
    and intended to cause such harm.
Day 8 Tr. at 22:24-23:8, ECF No. 243.

conditionally rule on a new trial motion pursuant to Federal
Rule of Civil Procedure 50(c)(1).

        a.   <u>Breach</u>

Broadridge contends that it is entitled to judgment as a
matter of law on the issue of breach of the Marketing Agreement
because (1) Plan Management did not produce evidence indicating
that the Marketing Agreement <u>required</u> a specific number of
referrals; (2) Plan Management failed to demonstrate that
Broadridge did not use commercially reasonable efforts to refer
Viable Clients; and (3) the heading "Referral Obligation" has no
meaning and cannot alter the meaning of the referral clause
given Paragraph 15(e) of the Marketing Agreement. Broadridge
makes this argument despite the Court's prior finding that
Agreement was ambiguous, and the jury would determine its
meaning. Plan Management argues that there was more than enough
evidence for the jury to find in Plan Management's favor and
that the jury was reasonable in finding that Broadridge breached
the Marketing Agreement.

The Court disagrees with Broadridge. The jury could have
reasonably concluded that Broadridge breached the Marketing
Agreement because it (1) did not use commercially reasonable
efforts and failed to meet the referral target,[7] or (2) that it

---

[7] The testimony at trial conflicted as to whether the Referral
Target was a "goal" or a "requirement." <u>Compare, e.g.,</u> Day 2

did use commercially reasonable efforts but still failed to meet the referral target, or (3) that there was no required number of referrals but Broadridge still failed to use commercially reasonable efforts to refer Viable Clients. In other words, it was reasonable for the jury to find that referring 20 Viable Clients over 5 years, out of a "target" 1221 Viable Clients, constituted a breach of the Agreement, even if Broadridge used commercially reasonable efforts to refer clients and even if precisely 1221 Viable Clients were not required.

On direct examination, Mr. Miller explained that "commercially reasonable efforts" would obligate Broadridge to do for Plan Management what Broadridge would do for itself, including but not limited to (1) creating a web portal; (2) using search engine optimization; (3) tracking "clicks" online; (4) inviting Plan Management representatives to networking opportunities; (5) naming a designated liaison; (6) checking in with Broadridge representatives frequently to ensure performance in line with the Marketing Agreement; (7) communicating with Plan Management more frequently regarding

---

Tr., 95:25-96:1, ECF No. 237 (testimony of Jonathan Miller) ("[T]hat's the minimum amount they're supposed to try and reach.") with Day 4 Tr. at 66:1, ECF No. 239 (testimony of Mark Kopelman) ("There's no formula, no guarantee."). But, the uncontroverted evidence showed that, regardless, Broadridge came nowhere close to meeting the Referral Target in any year of the term of the Marketing Agreement.

the referral process; and (8) following up more frequently with prospects. Day 2 Tr. 92:20-95:16, ECF No. 237.[8] Mr. Miller did not offer any testimony as to an industry-wide understanding of "commercially reasonable efforts" for referrals.

When discussing the course of performance of the Marketing Agreement, also on direct examination, Mr. Miller stated that he, among others at Plan Management (Laura Abarca, Christina Miller, Jen Levine, and Lisa Fidaleo), noticed the lack of referrals and made efforts to address Broadridge's failure to refer 200 Viable Clients in the first year of the contract. These attempts to get more referrals from Broadridge continued throughout the term of the Agreement: Mr. Miller testified that Plan Management continued to seek more referrals from Broadridge in 2011. Day 2 Tr. at 133:8-13, ECF No. 237. Plan Management eventually created a referral form to facilitate the referral process, "[b]ecause we were getting nowhere with the referrals from the people, the Broadridge salespeople." Id. at 136:2-3.

The evidence at trial, viewed in the light most favorable to Plan Management, indicated that despite Plan Management's attempts to improve the referral relationship, Broadridge did not improve its performance over time. For instance, Miriam

---

[8] This testimony was not objected to by Broadridge; however, the Court precluded later testimony by nonparties to the contract, namely Mark Kopelman, about their understanding of commercially reasonable efforts.

Felix, a Broadridge employee familiar with the Salesforce
database used by Broadridge to track contacts with corporate
issuer clients, testified that there was a significant decrease
in contacts from 2010 to 2015. See Day 4 Tr. at 134:17-137:20,
ECF No. 239.[9] The jury could have reasonably believed this
testimony and found that the decrease in Salesforce activity was
indicative of Broadridge's failure to refer clients.

Moreover, the testimony at trial, viewed most favorably to
Plan Management, indicated that Broadridge did not have
sufficient mechanisms in place to manage and track referrals. It
was Mr. Miller's impression that "[n]obody seemed to be really
in charge of" the agreed-upon referrals. Day 2 Tr. 131:24-133:4,
ECF No. 237. Jen Levine, who was employed by Broadridge and Plan
Management at different times, also testified that there was not
a process in place nor a particular point person at Broadridge
for referrals and demonstrations. Day 5 Tr. at 26:23-27:12, ECF
No. 240. Broadridge had no tracking mechanism for referrals. Id.
at 27:17-20.[10] At some point, Ms. Levine noted, Plan Management

---

[9] Ms. Felix did testify, however, that some of the contacts
needed to be manually entered into the database; thus, it is
possible that not all contacts with clients were recorded if a
sales representative of Broadridge intentionally or
unintentionally did not create a record of the contact. Day 4
Tr. at 146:20-147:10, ECF No. 239.

[10] Although Broadridge presented competing testimony that there
were designated liaisons from time to time, it is the province
of the jury to weigh the evidence. See Day 4 Tr. at 32:3-10,

itself created a spreadsheet or other record of referrals and demonstrations. See Day 5 Tr. at 46:1-20, ECF No. 240 (cross-examination of Jen Levine). Although there was no contractual obligation for either party to track the number of referrals, the jury could have reasonably found that it would have been commercially reasonable for Broadridge to track referrals.

This is not to say that the testimony was unequivocally in Plan Management's favor. The evidence indicated that Broadridge sales representatives took at least some efforts to refer clients under the Marketing Agreement.

For instance, the testimony at trial indicated that Broadridge salespeople understood that they would need multiple points of contact with a company to get the company interested in Plan Management's services--and Broadridge representatives often did make multiple contacts. Matthew Criscenzo, a Broadridge sales representative, described the sales process: "I typically would have to send three emails before I got a response. So I know as a process I would send multiple times similar types of emails to get them to respond to me." Day 6 Tr. at 75:12-14, ECF No. 241. As did Amy Pavich. See Id. at 157:15-

---

76:18-20, ECF No. 239 (testimony of Mark Kopelman stating that Marlayna Jeanclerc and John Weidman served as liaisons). This is especially the case where, as here, the alleged designated liaisons did not testify at trial. A missing witness instruction was not given to the jury.

158:12 (describing why it would take a Broadridge sales representative years or more to close a new prospect).[11]

Broadridge representatives also testified that there were a number of hurdles that arose during the term of the Agreement.

First, Broadridge representatives had difficulty finding clients which were actually interested in Plan Management's services. Not all companies that otherwise met the definition of "viable client" were interested in switching from their existing plan administrator to Plan Management. See Day 4 Tr. at 92:9-93:15, ECF No. 239 (testimony of Mark Kopelman) (describing an email chain with John Weidman in which a prospective client who

---

[11] Elena Thomas, Jonathan Miller's daughter and a Plan Management employee, similarly described the sales process:

> Often we do what's called consultative selling. So you're asking questions to understand what they're doing today, what their needs are, and then having a discussion with them about here's what we can do to help solve that problem. A lot of times, particularly when you're talking B2B sales, it can be a longer sales process because they have a lot of other things on their plate to do. There might be multiple decision-makers involved.
>
> So, you know, I think they say on average for kind of B2B software, it's seven or ten touch points before you often get real engagement. And then for us, they would see a platform demonstration where we would focus that demonstration based on what we've learned about them and their needs and then provide them with a proposal, see if there's any blocking hazards between us and them feeling that it's a good fit and help them together, work through those to see if it's the right solution.

Day 5 Tr. at 152:8-24, ECF No. 240 (direct examination of Elena Thomas). Her testimony thus reflects an understanding that "commercially reasonable efforts" would involve several contacts with a prospect over a period of time.

had used Merrill Lynch for plan administration declined to switch to Plan Management after receiving information about its services from Broadridge).[12]

Second, Broadridge representatives testified that their contacts with corporate issuer clients were not the proper person to talk to at the company regarding equity compensation plans. Amy Pavich, a former Broadridge sales representative, expressed difficulty in referring prospects to Plan Management. In particular, she testified that "[t]here was some difficulty because . . . my contacts would not know the information that I was trying to ask who their plan administrator was or if there was a need on that side of things," because her contacts with corporate issuer clients were "usually the decision makers for

---

[12] In addition, it appeared that Plan Management did not necessarily expect to close on many referrals:

> There were just very few, as we just saw on the list, who really were a good fit for us and really wanted our product. I think at times the salespeople were just trying to add it in to maybe get the commission added into their list of products they were trying to sell, but the client wasn't really a fit for what we had to offer. So, providing the name wasn't necessarily an interested client, it was just a reference.

Day 5 Tr. at 106:1-8, ECF No. 240 (redirect of Jen Levine). This evidence indicated that the Referral Target may have been ambitious, but, Broadridge has not specifically argued that the number was impossible, impracticable, unconscionable, or that any of Plan Management's actions in connection with the referral process could have frustrated the purpose of the contract. Sophisticated parties, with assistance of counsel, formed this agreement among numerous others. Plaintiff acknowledges as much in its response in opposition. See ECF No. 269 at 10 n.2.

transfer agent services." Day 6 Tr. at 159:5-12, 159:21-160:3,
ECF No. 241.

Third, an apparent lack of prompt communication between
Plan Management and Broadridge created obstacles in the referral
relationship. Mr. Kopelman testified that Plan Management was
not diligent in responding to client inquiries from Broadridge
representatives, which made it more difficult to make referrals.
Day 4 Tr. at 26:2-13, ECF No. 239. "[I]f it takes 24 or 48, 36
hours to get back to the client, the client sees that as an
indication that perhaps the ongoing service experience won't be
right." Id. at 31:4-7. Mr. Kopelman also testified that Plan
Management provided Broadridge marketing materials at some point
within the first year of the contract, but "it took a while."
Id. at 36:7-15.

Despite these difficulties mentioned by certain Broadridge
representatives who testified, the evidence was uncontroverted
that Individual Broadridge sales representatives were not made
aware of any requirement to refer a particular number of
clients. Day 6 Tr. at 49:18-20, ECF No. 241 (direct examination
of Matthew Criscenzo); id. at 146:25-147:1 (direct examination
of Amy Pavich); Day 7 Tr. at 52:11-13, ECF No. 242 (direct
examination of Megan Flemming). Given that Broadridge
representatives would receive a bonus for referring clients, Day
6 Tr. at 51:6-54:7, ECF No. 241, the jury could have found that

21

it was not commercially reasonable for Broadridge to fail to make its representatives more aware of the Marketing Agreement and accompanying financial incentives.

In addition, there was no testimony from Broadridge senior executives about what would be commercially reasonable for its representatives to do. There was no testimony as to Broadridge's "economic interests" including but not limited to marketing costs, the time spent by Broadridge representatives in making referral efforts, any efforts by Broadridge to seek new clients and market Plan Management's services to such new clients, or Broadridge's use of search engine optimization or other wide-ranging or non-targeted marketing efforts. Without this testimony, the jury was only faced with testimony regarding Broadridge's lack of diligence in its performance of the Marketing Agreement. Thus, it was reasonable for the jury to rely on the testimony regarding the contractual language and performance of the contract in determining that Broadridge was in breach.

Viewing all the evidence in the light most favorable to Plan Management, it was reasonable for the jury to conclude that Broadridge's efforts were insufficient to meet the terms of the Marketing Agreement.

b.   <u>Gross Negligence or Willful Misconduct</u>

Following a verdict in favor of Plan Management as to both gross negligence and willful misconduct, Broadridge argues that the evidence was insufficient to find that it acted with gross negligence or willful misconduct in its performance of the Marketing Agreement. Broadridge points to testimony at trial indicating that its representatives intended to perform the Marketing Agreement (and wanted Plan Management to succeed). Broadridge also points to testimony from both Plan Management and Broadridge witnesses indicating that it often took a number of contacts, over a number of years, to get a client interested in additional services.[13]

On the other hand, Plan Management argues that the jury reasonably found that Broadridge acted with gross negligence or willful misconduct in breaching the Marketing Agreement because (1) Broadridge's referral efforts were too generic; (2) Broadridge lacked any system to track referrals or request referral fees; (3) Broadridge failed to use the referral forms provided by Plan Management to facilitate referrals; and (4) no

---

[13] Again, however, Broadridge does not now, nor has it previously, argued that the length of time that it would take for its representatives to successfully refer a Viable Client to Plan Management would have exceeded the Term of the Marketing Agreement, making performance impracticable or impossible.

representative of Broadridge ever reached out to Plan Management regarding referral difficulties.

The evidence produced at trial, viewed in the light most favorable to Plan Management, did not show that Broadridge breached the Marketing Agreement willfully. However, there was sufficient evidence produced at trial for a reasonable jury to find that Broadridge was grossly negligent in performing the Marketing Agreement.

As discussed in subsection III.A.2.a. above, the evidence at trial showed that Broadridge representatives took some steps to refer leads to Plan Management. But, the testimony tended to indicate that Broadridge's failure to refer Viable Clients resulted from more than mere negligence, by means of (1) Broadridge's failure to track referrals; (2) Broadridge's failure to send more personalized, detailed correspondence to prospects; and (3) Broadridge's general apathy to Plan Management's requests for additional referrals.

First, the evidence indicated that it would have been prudent for Broadridge to track referrals, despite not being contractually obligated to do so. This is especially so in light of the testimony that Broadridge representatives were aware of Plan Management's dissatisfaction with the referral numbers throughout the term of the contract: although Mr. Miller did not write a formal letter of breach until 2014, he repeatedly

24

reached out to Broadridge representatives seeking additional referrals. <u>See</u> Day 3 Tr. at 66:8-10, ECF No. 238 ("We sent numerous messages to various people, contacts, saying, where are the referrals we've [been] promised? Why are we not getting referrals?"); <u>id.</u> at 96:8-10 ("[T]here are numerous emails from us to Broadridge saying . . . [w]hy are we not getting referrals to me? Why is this arrangement [] not working."); <u>see also</u> Day 2 Tr. at 136:2-3, ECF No. 237 (stating that Plan Management created the referral form "[b]ecause we were getting nowhere with the referrals from the people, the Broadridge salespeople"). Broadridge employees thus were, or should have been, on notice that their conduct departed from the standard of care established by the Marketing Agreement.[14] The jury could have reasonably found that Broadridge was grossly negligent for failing to improve its performance.

Second, as Plan Management argues, the emails memorialized in the Salesforce database excerpt (Broadridge's Exhibit 5/Plaintiffs' Exhibit 349) indicate that the quantity of

_____

[14] There was no testimony as to the industry standard of care in interacting with clients and referring clients. But, such testimony is not required to establish the standard of care. <u>See, e.g.</u>, <u>Moushey v. U.S. Steel Corp.</u>, 374 F.2d 561, 567 (3d Cir. 1967); <u>see also</u> <u>Bourgeois v. Snow Time, Inc.</u>, 242 A.3d 637, 659 (Pa. 2020) (holding that it was error for the Superior Court to reject an expert report for failing to set forth a standard of care where the report created an issue of fact as to whether a party was on notice of a risk of harm).

contacts overrepresents the efforts taken by Broadridge sales
representatives. Plan Management argues that Broadridge cannot
claim that it made a significant effort to comply with the
contract where at least 500 of the 2000 recorded contacts were
mass-marketing emails that did not specifically discuss Plan
Management's services.[15] See Pl.'s Resp. at 24, ECF No. 248.
These emails were not individually tailored to each client. Yet,
Broadridge representatives testified that not all contacts with
clients would be memorialized in Salesforce--only if follow up
was required. See Day 6 Tr. at 65:14-66:6, 68:6-8, ECF No. 241
(testimony of Matthew Criscenzo); id. at 130:5-7 ("[I]f I sent
an email out to an issuer and they didn't respond, I would not
certainly enter that into Broadforce of Salesforce because
there's no follow-up required on that email."). A reasonable
jury could have believed this evidence, or decided that it was a
poor excuse for a failure to make greater referral efforts, or

---

[15] Plan Management also focuses on the use of "plan management"
as a general term rather than a company name, and the lack of
references to OptionTrax in Broadridge's recorded contacts to
show that Broadridge was grossly negligent or willful in failing
to meet the referral obligation. But Plan Management witness
Elena Thomas testified that it would take several contacts with
a prospect in order to get a client interested in additional
services. Thus, the fact that Broadridge used general terms in
its contacts with clients, especially in the mass-marketing
email blasts, is not necessarily probative of the quantity or
quality of efforts that Broadridge used. Moreover, it is likely
that Broadridge's clients were not particularly familiar with
Plan Management or OptionTrax, and so these terms could have
created confusion.

instead believed that it was grossly negligent for Broadridge not to record all communications with potential referrals.

Third, the testimony at trial indicated that Broadridge representatives were not overly concerned with increasing referrals or improving the referral process--despite having a contractual obligation and financial incentive to do so. Although the representatives experienced certain hurdles--not knowing the right contacts with a client or learning that the client did not need additional services--there was no evidence indicating that Broadridge representatives tried to find additional clients who could be Viable Clients or otherwise tried to get the contact information of the appropriate corporate representatives. Nor was there evidence that Broadridge representatives contacted Plan Management about these difficulties or sought to discuss a new strategy for referrals. Day 2 Tr. at 136:14-24, ECF No. 237 (direct examination of Jonathan Miller).

Yet, there was no evidence produced at trial that indicated that Broadridge <u>willfully</u> breached the Marketing Agreement or acted in bad faith. Testimony from Broadridge sales representatives indicated that they would only intentionally not mention Plan Management or make a referral effort when communicating with existing corporate issuer clients when doing so would be <u>commercially inappropriate</u>, such as (1) during proxy

season and (2) before a representative had ascertained the needs of the particular client. See, e.g., Day 6 Tr. at 74:9-16, ECF No. 241 (testimony of Matthew Criscenzo); id. at 156:16-20 (testimony of Amy Pavich). This testimony, uncontroverted, thus set some boundaries on what would be considered "commercially reasonable" in the context of the Marketing Agreement. To the extent that the jury disregarded this testimony, it was not reasonable to do so.

Ms. Pavich, another Broadridge sales representative, understood that the Marketing Agreement created a synergistic partnership. Day 6 Tr. at 145:5-7, ECF No. 241 ("My understanding was that it was a referral partnership and that we were to refer any leads that we would uncover to PMC for plan administration services."). See note 12, supra. As did Matthew Criscenzo, who described the Marketing Agreement as a "win-win" because it allowed him "opportunities to get into the client and offer more services." Day 6 Tr. at 51:2-5, ECF No. 241. Thus, there was testimony from Broadridge witnesses that they intended to perform under the Marketing Agreement.

For the jury to have found that Broadridge acted willfully, the jury must have disregarded the testimony of Broadridge's witnesses entirely and assumed that if Broadridge referred so few clients, it must have done so willfully. But, even if the testimony of the Broadridge witnesses was not believed, Plan

Management failed to introduce sufficient evidence of willful breach: the evidence only supports the conclusion that Broadridge was grossly negligent, not willful, in its breach of the Marketing Agreement. There was no evidence indicating that Broadridge was aware that its failure to use commercially reasonable efforts to refer viable clients would cause harm to Plan Management, <u>and intended</u> to cause such harm, as the jury was instructed. In the absence of such evidence regarding the intent to cause harm, the jury had no reasonable basis upon which to find that Broadridge had breached the Marketing Agreement willfully.

Thus, the motion for judgment as a matter of law will be denied as to breach and gross negligence, but granted as to willful misconduct. The Court need not conditionally rule on a motion for a new trial, however, because the jury only need have found either gross negligence or willful misconduct in order to award consequential damages.

B.   **<u>Motion for a New Trial</u>**

Broadridge moves for a new trial, generally asserting the same grounds as contained in its motion for judgment as a matter of law. Mr. Miller also moves for a new trial, his fraudulent inducement claim having been disposed of at the close of Plaintiffs' case. The Court addresses these motions in turn.

1. <u>Legal Standard</u>

Under Federal Rule of Civil Procedure 59, "[t]he court may, on motion, grant a new trial on all or some of the issues--and to any party . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). When ruling on a motion for a new trial, as with a motion for judgment as a matter of law, the Court "does not substitute its 'judgment of the facts and the credibility of the witnesses for that of the jury.'" <u>Sheridan v. E.I. DuPont de Nemours & Co.</u>, 100 F.3d 1061, 1076 (3d Cir. 1996) (quoting <u>Fineman v. Armstrong World Indus., Inc.</u>, 980 F.2d 171, 211 (3d Cir. 1992)). However, when ruling on a motion for a new trial, the Court need not view the evidence in the light most favorable to the verdict-winner. <u>Taha v. Bucks County Pennsylvania</u>, 408 F. Supp. 3d 628, 643 (E.D. Pa. 2019) (citing <u>Wilson v. Philadelphia Det. Ctr.</u>, 986 F. Supp. 282, 287 (E.D. Pa. 1997)).

"A new trial may be granted 'when the verdict is contrary to the great weight of the evidence; that is where a miscarriage of justice would result if the verdict were to stand' or when the court believes the verdict results from jury confusion." <u>Brown v. Nutrition Mgmt. Servs. Co.</u>, 370 F. App'x 267, 269-70 (3d Cir. 2010) (quoting <u>Pryer v. C.O. 3 Slavic</u>, 251 F.3d 448, 453 (3d Cir. 2001)); <u>accord</u> <u>Farra v. Stanley-Bostitch, Inc.</u>, 838

F. Supp. 1021, 1026 (E.D. Pa. 1993) (Robreno, J.). Or, a new trial may be granted "where substantial errors occurred in admission or rejection of evidence." Goodman v. Pa. Turnpike Comm'n, 293 F.3d 655 (3d Cir. 2002). But, "[u]nless justice requires otherwise, no error in admitting or excluding evidence--or any other error by the court or a party--is ground for granting a new trial [or] for setting aside a verdict . . . ." Fed. R. Civ. P. 61.

In addition, the mere fact that a party presented witnesses in support of its claim "sheds no light on the credibility or weight the jury accorded such evidence"; thus, a new trial cannot be granted solely on the basis that a party has presented some evidence. Jester v. Hutt, 937 F.3d 233, 239-40 (3d Cir. 2019). In other words, "where the evidence is in conflict, however, and subject to two or more interpretations, the trial judge should be reluctant to grant a new trial." Bender v. Norfolk S. Corp., 31 F. Supp. 3d 659, 664-65 (M.D. Pa. 2014) (citing Klein v. Hollings, 992 F.2d 1285, 1295 (3d Cir. 1993)).

2.   Broadridge's Motion for New Trial

Broadridge contends that "[t]he jury in this case fundamentally misinterpreted the Marketing Agreement and failed to appropriately apply the law as instructed." Def.'s Mot. for New Trial at 1, ECF No. 258. In support of this argument, Broadridge points to the text of the Marketing Agreement

31

(including paragraph 15(e), which limits the function of headings to "convenience"); testimony at trial regarding the scope of the Marketing Agreement (i.e., that neither party to the contract was required by the contract to track referrals); and testimony at trial regarding Broadridge's "commercially reasonable efforts" to refer Viable Clients. Broadridge also argues that whether or not a referred client viewed a demonstration of OptionTrax--a requirement for a referred client to become a "Viable Client" was out of its control; accordingly, "Broadridge had no control over whether its efforts ultimately resulted in a specific number of 1220 referrals of 'viable clients.'" Id. at 8.[16]

Broadridge further contends that it is entitled to a new trial because the Court made of a number of prejudicial errors in admitting evidence. Broadridge argues that the Court's rulings regarding pre-execution documents and Mr. Miller's subjective understanding of the Marketing Agreement were prejudicial error. Before trial, Broadridge lodged boilerplate objections as to many of Plaintiffs' exhibits. See Def.'s Pretrial Mem. App. H, ECF No. 202-8. Broadridge renews its

---

[16] Although Broadridge argues that Plan Management had to take action on referrals in order for them to meet the contractual definition of "Viable Client," Broadridge does not set forth any argument as to a justification for nonperformance--such as frustration of purpose by means of Plan Management's failure to timely capitalize on all referred clients.

objections as to certain of those documents (P-039, P-040, P-042, P-047, P-052, P-184, P-331, P-344, and P-345). Broadridge also argues that Mr. Miller's direct testimony regarding his understanding of the Marketing Agreement was improper. Broadridge did not object to that testimony during trial.

Plan Management counters that there was sufficient evidence for the jury to find in its favor; the verdict did not result in a miscarriage of justice; the verdict does not shock the conscience; and any trial error that may have occurred was harmless. Pls.' Resp. at 2, ECF No. 269.

"[A] party who fails to object to errors at trial waives the right to complain about them following trial." Waldorf v. Shuta, 142 F.3d 601, 629 (3d Cir. 1998); see also State Farm Mut. Auto Ins. Co. v. Lincow, 715 F. Supp. 2d 617, 635-36 & n.16 (E.D. Pa. 2010) (stating that a foundation objection not raised at trial was waived for purposes of a motion for a new trial); Wells v. Loizos, No. 06-2320, 2015 WL 685126, at *2 (E.D. Pa. Feb. 18, 2015); Christine v. Davis, 600 F. App'x 47, 50 (3d Cir. 2015) ("[A]s Christine did not make a contemporaneous objection to the introduction of [an exhibit], that issue is waived [in a motion for a new trial]."). Because Broadridge did not object to Mr. Miller's testimony regarding his general understanding of the contract and the meaning of "commercially reasonable

efforts," the objection to Mr. Miller's testimony was waived. See Day 2 Tr. at 92:20-95:16, ECF No. 237.[17]

But, the Court may review a waived objection where counsel "failed to object to a fundamental and highly prejudicial error resulting in a miscarriage of justice." Fleck v. KDI Sylvan Pools, Inc., 981 F.2d 107, 116 (3d Cir. 1992). However, even if Mr. Miller's testimony and certain pre-execution documents were erroneously admitted, Broadridge has not demonstrated that it was prejudiced.

As to Mr. Miller's testimony regarding "commercially reasonable efforts," Broadridge did not present any evidence regarding the economic factors that would have determined the breadth and depth of its referral efforts, nor testimony concerning what was "commercially reasonable." Instead, Broadridge presented the jury with testimony regarding the diligence of Broadridge and Plan Management representatives. Therefore, Broadridge has not shown that any errors made by the Court affected its substantial rights, requiring the Court to consider its waived objections.

As to certain pre-execution documents to which Broadridge objected prior to trial, Broadridge was also not prejudiced.

---

[17] Broadridge did object at one point to Mr. Miller's estimate of some percentage of public companies. Day 2 Tr. at 93:20-21, ECF No. 237. That objection is irrelevant for these purposes.

These documents do not provide substantial context as to the interpretation of the contract. Rather, these documents tend to describe the due diligence and acquisition process without stating in any detail the meaning of "referral target" or "commercially reasonable efforts." In addition, at the close of trial, the jury was instructed that "Plan Management and Broadridge agree that the Marketing Agreement represents the entire agreements between them because it is a written contract fully executed by both parties." Day 8 Tr. at 20:4-7, ECF No. 243. In light of the substance of these exhibits and the limiting instruction to the jury, Broadridge cannot have been prejudiced.

Broadridge has not shown that it is entitled to a new trial as to liability. It has not pointed to any error that would warrant disturbing the jury's verdict. Nor has Broadridge shown that the verdict was against the great weight of the evidence or that allowing the verdict to stand would be a miscarriage of justice. Rather, as discussed in section III.A.2 above, this is a case where both parties presented evidence of their own interpretation of the ambiguous Marketing Agreement and the efforts that were made to refer clients, and the jury found the evidence to weigh in favor of Plan Management. See Jester v. Hutt, 937 F.3d at 239-40. Accordingly, Broadridge's motion for a new trial as to liability will be denied.

35

3.    Plaintiff Jonathan Miller's Motion for New Trial

To make out a claim for fraudulent inducement, Mr. Miller must demonstrate that there was "(1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance." Eigen v. Textron Lycoming Reciprocating Engine Div., 874 A.2d 1179, 1185 (Pa. Super. Ct. 2005). A plaintiff bringing a fraudulent inducement claim typically must show deception by the defendant, and must prove all six elements of fraudulent inducement by clear and convincing evidence. SodexoMAGIC, LLC v. Drexel Univ., 24 F.4th 183, 205, 217 (3d Cir. 2022). A broken promise is not the same as a fraudulent inducement claim; a plaintiff must demonstrate that the defendant never intended to perform the contract. Ohama v. Markowitz, 434 F. Supp. 3d 303, 317–18 (E.D. Pa. 2020).

Mr. Miller contends that the Court improperly dismissed his fraudulent inducement claim at the close of Plaintiffs' case. Broadridge argues that the Court properly dismissed the claim as Mr. Miller has failed to prove all six elements of a fraudulent

inducement claim by clear and convincing evidence.[18] Mr. Miller has not made the requisite showing as to all six elements of fraudulent inducement.

On one hand, Mr. Miller did show that there was a material representation regarding the number of Viable Clients that Broadridge would refer. Mr. Miller also demonstrated by clear and convincing evidence that a failure of Broadridge to live up to that representation would have caused and did cause harm--for example, the exclusivity clause in the Marketing Agreement prevented Plan Management from building relationships with other firms during the five-year term of the contract.

---

[18]   Broadridge also contends that Mr. Miller's fraud claims are time-barred; Mr. Miller argues that his claim is not. As an affirmative defense, Broadridge bears the burden of proving that the claim is time-barred. See Fed. R. Civ. P. 8(c)(1). Pennsylvania has a two-year statute of limitations on fraud claims. 42 Pa. Cons. Stat. § 5524(7). Plaintiffs filed this lawsuit on January 28, 2015; thus, for the claim to be time-barred, Broadridge must have proved that Mr. Miller knew or had constructive knowledge of the alleged fraud on or before January 28, 2013.

Broadridge failed to meet this burden. Mr. Miller acknowledged that Broadridge's performance was deficient under the Marketing Agreement, and stated that he did not send a notice of breach early in the contract term because "I hoped that they were really going to try to do it, that they intended to try." See Day 3 Tr. at 127:8-9, ECF No. 238 (redirect of Jonathan Miller). The jury could have reasonably concluded that this testimony indicated that Broadridge was not performing as it should have been under the Agreement, but that Mr. Miller genuinely believed that Broadridge would improve its performance throughout the life of the Marketing Agreement.

On the other hand, however, a reasonable jury could not have found, by clear and convincing evidence, that Broadridge's statements in the Marketing Agreement were "made falsely, with knowledge of its falsity or recklessness as to whether it is true or false." Although Plaintiffs point to statements by Mr. Kopelman describing his understanding of Broadridge's obligations under the contract, a person's understanding of their duty to perform a contract is not the same as their intent to perform the contract at the time it is executed. Moreover, Broadridge points to certain admitted documents that demonstrate that it did make some efforts under the Marketing Agreement to refer clients. See Def.'s Ex. 62; Pls.' Ex. 128. Plaintiffs also adduced no evidence regarding Broadridge's intent to perform at the time of contracting; rather, Plaintiffs have only provided evidence that their interpretation of the contract and Broadridge's interpretation of the contract differed.

Even if a jury could find that the statements were made falsely, a reasonable jury could not find by clear and convincing evidence that Broadridge did so "with the intent of misleading another into relying on it." Plaintiff Jonathan Miller testified at trial that he was not forced to sell StockTrans. Day 3 Tr. at 43:2, ECF No. 238. As Broadridge notes, "[a]bsent from the record is any testimony or documentary evidence showing that Broadridge sought to acquire Mr. Miller's

company with fraudulent intent." Instead, the record indicated that, while an acquisition would certainly be lucrative for Broadridge, Broadridge and Miller sought to maintain a healthy working relationship. See Pl.'s Ex. 345 at 4; Day 3 Tr. 46:16-17, ECF No. 238 ("Why would I [send a notice of breach] when I wanted them to continue, when I was hoping they would do what they actually promised to do."); Day 4 Tr. 27:3-9, ECF No. 239 ("[W]e needed Mr. Miller. . . . He knows the market well. He was a good advisor. He was the expert on plan management. We had a three-year consulting agreement where we were counting on his expertise. We had a five-year agreement at the time with Plan Management and it was part of a long-term relationship we were trying to build.").

Broadridge was aware of Mr. Miller's attachment to his companies and took care to make an offer that was fair and reasonable. Mark Kopelman, on examination by Plan Management, noted that Broadridge representatives were aware "that Mr. Miller has shown an emotional attachment to his business." Day 3 Tr. at 148:19-21, ECF No. 238. Further, Broadridge representatives "believe[d] it [was] essential to provide a serious, thoughtful offer. We believe the perception of 'bargain hunting' would be poorly received and hurt the prospects for a deal." Id. at 156:17-20.

Finally, the record does indicate that the purchase of StockTrans would be profitable for Broadridge. See Pl.'s Ex. 345. But, that Broadridge wanted to purchase StockTrans because of the potentially profitable business opportunity does not, without further evidence of motive, show by clear and convincing evidence that Broadridge intended to mislead Mr. Miller into relying on the representations made in the Marketing Agreement. This is especially true where the trial testimony indicated that Broadridge knew of Mr. Miller's desire to have a marketing alliance for a number of months before the contracts were finalized, and that "Broadridge was not going to commit to a particular number of either referrals or nor certainly sales. And that was a clear point of discussion over many months." Day 4 Tr. at 22:20-24, 66:4-7, ECF No. 239.

Accordingly, because there was insufficient evidence for Mr. Miller to sustain his claim, by clear and convincing evidence, that Broadridge acted with fraudulent intent in promising that it would perform the Marketing Agreement in exchange, in part, for the sale of StockTrans, there is no miscarriage of justice in allowing the Court's prior ruling to stand. Mr. Miller's motion for a new trial will be denied.

## IV.  MOTIONS AS TO DAMAGES

Having found for Plan Management as to liability, the jury awarded Plan Management $25,000,000.00 in compensatory damages.

Broadridge challenges the damages award on the grounds that Mr. Molder's expert report was not sufficiently based in the trial record. Broadridge seeks first to strike Mr. Molder's expert report, which it argues must result in judgment as a matter of law in its favor or a granting of a new trial. In the alternative, Broadridge seeks remittitur of the damage award. On the other hand, Plan Management argues that the damage award was proper and seeks post-judgment interest. These motions will be addressed in turn.

### A.   Motion to Strike Expert Report

The Court first addresses Broadridge's motion to strike the report and testimony of Mr. Molder, as "erroneously admitted evidence should not be considered when ruling on motions for judgment as a matter of law." Goodman, 293 F.3d at 665 (citing Lightning Lube, 4 F.3d at 1199-1200). Plan Management called Mr. Molder to testify as to Plan Management's projected lost profits caused by Broadridge's failure to refer clients under the Marketing Agreement.

Broadridge seeks to strike the expert report of Michael Molder on the grounds that (1) Plan Management did not introduce any evidence of the facts underlying Mr. Molder's assumptions; (2) Mr. Molder did not independently investigate any of the data provided to him or consult any materials other than those provided by Plan Management; and (3) Mr. Molder did not use

41

complete data in his report. More specifically, Broadridge contends that Plan Management failed to introduce evidence to demonstrate the key factors comprising Mr. Molder's lost profits calculation: (1) a conversion rate; (2) a retention rate; (3) a "license fee"; and (4) pricing. Accordingly, Broadridge argues, the expert testimony was not based on sufficient facts nor was it helpful, making such testimony inadmissible under Federal Rule of Evidence 702. See Def.'s Suppl. Mot. to Strike 2-3, ECF No. 255.

Plan Management contends, on the other hand, (1) that the trial record contains sufficient evidence to establish the facts underlying the expert testimony and (2) that there is no duty for an expert witness to independently investigate "a company's routine pricing when calculating lost profits." Pl.'s Resp. to Mot. to Strike 1-2, ECF No. 268. Plan Management further argues that the sidebar discussion with the Court prior to the direct examination of Mr. Molder indicates that Broadridge conceded admissibility and would only challenge the weight of the evidence on cross examination. Id. at 14-15, ECF No. 268. Moreover, Plan Management argues that Broadridge had a full and fair opportunity to cross examine Mr. Molder, and the Court should respect the jury's verdict in light of such cross examination. Id. at 6.

Given that, at trial, there was insufficient evidentiary support for Mr. Molder's conclusions regarding Plan Management's fees for the clients that Broadridge failed to refer, his calculation was not helpful and should have been stricken.

### 1.   Legal Standard

Under Federal Rule of Evidence 702,

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>     (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>     (b) the testimony is based on sufficient facts or data;
>     (c) the testimony is the product of reliable principles and methods; and
>     (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

In determining whether a witness may testify as an expert, the Court makes "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 592-93 (1993). After the Court determines that an expert's opinion is sufficiently reliable, the jury assesses the sufficiency and credibility of the expert testimony. Brill v. Marandola, 540 F. Supp. 2d 563, 568 (E.D. Pa. 2008) ("Questions as to the

sufficiency of an expert's factual basis are generally left to the jury." (quoting JMJ Enters. V. Via Veneto Italian Ice, No. 97-0652, 1998 WL 175888, at *6 (E.D. Pa. Apr. 15, 1998))).

Expert witnesses have broader latitude in their testimony than lay witnesses:

> An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted. But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect.

Fed. R. Evid. 703; see also Williams v. Illinois, 567 U.S. 50, 57 (2012) ("Under settled evidence law, an expert may express an opinion that is based on facts that the expert assumes, but does not know, to be true. It is then up to the party who calls the expert to introduce other evidence establishing the facts assumed by the expert."). Thus, although the data or facts underlying an expert's opinion need not be admissible, the expert opinion must have some basis in the record; otherwise, it is neither helpful nor relevant to the issues in the case.

Evidence is considered "helpful," in part, if there is a "connection between the expert opinion offered and the particular disputed factual issues in the case." In re TMI Litig., 193 F.3d 613, 670 (3d Cir. 1999). The Third Circuit has

a "presumption of helpfulness" regarding expert testimony. United States v. Downing, 753 F.2d 1224, 1241 (3d Cir. 1985). But, in order for expert testimony to be "helpful," as previously noted, it must be supported by the record. E.g., Elcock v. Kmart Corp., 233 F.3d 734, 755-56 (3d Cir. 2000); Meadows v. Anchor Longwall & Rebuild, Inc., 306 F. App'x 781, 790 (3d Cir. 2009) ("[E]xpert testimony based on assumptions lacking factual foundation in the record is properly excluded.").

"The 'ultimate touchstone is helpfulness to the trier of fact, and with regard to reliability, helpfulness turns on whether the expert's technique or principle [is] sufficiently reliable so that it will aid the jury in reaching accurate results.'" In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 744 (3d Cir. 1994) (quoting DeLuca ex rel. DeLuca v. Merrell Dow Pharms., Inc., 911 F.2d 941, 956 (3d Cir. 1990)). Therefore, "any step that renders the analysis unreliable under the Daubert factors renders the expert's testimony inadmissible." Id. at 745 (emphasis omitted).

2.   Analysis

The Court previously held that Mr. Molder's calculations were admissible so long as the factual assumptions underlying his calculations were adduced at trial, given that he was qualified to render an opinion, and used reliable methods (i.e.,

arithmetic) to reach his conclusions. Paramount Fin. Commc'ns, Inc., 2018 WL 7815202, at *9-10. The factual assumptions underlying Mr. Molder's opinions included "(1) that plaintiffs will prevail on issues of liability, (2) the numbers by which Broadridge fell short of 200 Viable Client referrals annually, (3) Plan Management's conversion rate of 27.5%, (4) a typical client retention period of 4 years, (5) various fees charged by Plan Management in exchange for services, and (6) various costs incurred by Plan Management in rendering its services." Id. at *8 n.10.

Mr. Molder's general theory of the calculation was to "look at the difference between what would have happened had the transaction gone as anticipated versus what happened if it didn't" based on the "understanding" that "Broadridge was to refer over the course of five years approximately 1200 potential customers for Plan Management." Day 8 Tr. at 139:23-140:3, ECF No. 243. From that calculation, Mr. Molder "deducted the additional cost that Plan Management would have incurred had they actually had all of those additional customers." Id. at 140:10-12. He explained the lost profits calculation as follows:

> So the general formula for calculating lost profits in this situation is the number of referrals that Broadridge would send to Plan Management for which there were presentations made. That had to get reduced to the number of actual referrals that turned into customers, which gets back to the conversion rate or close rate, whatever you want to call it. And then because it's not

> a one-time transaction, these are relationship driven
> customers. And so in order to find out how much revenue
> that referral that customer, that new customer was going
> to generate, I needed to have an idea of how long they
> would last and continue to subscribe to Plan Management
> services.

Day 8 Tr. at 143:6-17, ECF No. 243. The logic and arithmetic

underlying Mr. Molder's calculations appear correct and

reasonable. At issue, thus, is whether there was a sufficient

factual basis at trial for the numbers upon which he relied for

his calculations.

Mr. Molder testified that the conversion rate was

"approximately one in three," and arrived at this rate by

looking at "the number of customers [Plan Management] got from

presentations to publicly traded companies in the time period."

Id. at 141:7-23.[19] Mr. Molder focused on publicly traded

companies because those were "the majority of referrals

[Broadridge was] making . . . ." Id. at 142:7. Mr. Miller

described the conversion rate, or closing rate, as of "how many

of the prospects that you know are viable prospects, how many

did you actually sign up as clients," and stated that the rate

with regard to viable clients referred by Broadridge "was five

---

[19] The Conversion Rate that Mr. Molder used in his calculation
pertained solely to Plan Management's ability to close clients
that were referred by Broadridge. The Conversion Rate
calculation was not derived from the general closing rate during
the term of the Marketing Agreement. It was thus not clear how
many clients Plan Management would stand to gain in a given year
aside from any referral efforts by Broadridge.

out of 18, which I believe is about 27, 28 percent." Day 2 Tr.
at 103:1-19, ECF No. 237. Mr. Miller further recalled that "our
general range of clients closing was from 27 to 35 percent at
the time." Id. at 103:12-14. Mr. Miller testified that "over the
life of the marketing agreement," only "eighteen to twenty"
viable clients were referred to Plan Management by Broadridge.
Id. at 102:7-10. This testimony provided a sufficient
evidentiary basis for Mr. Molder's conversion rate calculation.

To determine the retention rate, Mr. Molder looked to the
list of closed accounts, reasoning that it would otherwise be
too speculative to derive an average period of time that a Plan
Management client remained a client from customer accounts that
were still active. Day 8 Tr. at 143:20-144:7, ECF No. 243.[20] Mr.
Molder only looked at data for public companies, as the
Marketing Agreement specified that Broadridge would refer public
companies.

For pricing, Mr. Molder relied on internal Plan Management
price matrices provided by Mr. Miller and Ms. Thomas. Id. at
144:14-18. Given that pricing is highly individualized, Mr.
Molder "could only look at the setup fee, which was bringing the

---

[20] As Broadridge notes, Mr. Molder did not provide a detailed
explanation for making this assumption other than to state that
the sample could be "biased" by including newer (and older)
customers who maintained an active relationship with Plan
Management.

customer on board and setting up the plan in Plan Management's system and the annual licensing fee that Plan Management charged for access to the software." Id. at 145:13-16. During the liability phase of trial, Mr. Miller testified that Plan Management clients can license their software to administer employee benefit plans, or that Plan Management can administer the plans for the clients. Day 2 Tr. 40:15-21, ECF No. 237.

Mr. Molder created his own sampling of potential Viable Clients from a total client list provided by Broadridge. He looked to SEC filings for those companies in the selected sample to determine the number of participants in an employee stock purchase plan and thus ascertain the "typical Broadridge customer." Mr. Molder then asked Ms. Thomas what Plan Management's fee would be, for a customer of that size, and used that fee in his calculations. Day 8 Tr. at 146:1-16, ECF No. 243. Of note, Mr. Molder was only able to determine the number of employees at a given public company, and did not have any data as to the number of plan participants. Without explanation, he assumed that the number of plan participants was equal to the number of employees. Mr. Molder observed that the median number of employees in the companies sampled increased over time, and assumed that the number of employee participants in a plan also

increased over time. Id. at 150:6-15.[21] Elena Thomas testified that "our bell curve has always been about 50 to 150" participants in a client's plan. Id. at 125:25-127:6 (cross-examination of Elena Thomas).

Mr. Molder then multiplied the licensing fee and setup fee by the number of clients that should have been closed to ascertain the lost revenue for each year. Id. at 150:22-152:14. Then, for each subsequent year that a closed client was a client--determined by multiplying the number of clients by the retention rate--Mr. Molder applied the yearly license fee. Id. at 152:14-23.

Mr. Molder next subtracted the costs avoided. From reviewing Plan Management's financial statements, Mr. Molder concluded that the costs to be deducted from the revenue related to additional employees or computer facilities--factors that would vary with revenue and the number of clients. Id. at 146:24-147:5. He enumerated the costs as: (1) the $1,000 referral fee payable to Broadridge per closed Viable Client; (2) debt from unpaid client invoices, determined by reference to Plan Management financial statements; (3) information technology

---

[21] According to Plaintiff's Exhibit 302, the generic pricing matrix, the pricing would be the same for 301 to 500 plan participants.

costs; (4) staffing, sales, and marketing; and (5) customer
support. See id. at 153:21-155:25.

Ultimately, Mr. Molder concluded that the lost profits over
the term of the contract would have been approximately
$24,500,000. Id. at 156:22-23.

Significant flaws in Mr. Molder's opinion were exposed upon
cross examination: (1) he did not explain his assumption
regarding the connection between the number of employees and the
number of plan participants and (2) he did not try to determine
the median number of plan participants. In addition, as
Broadridge pointed out a number of times, Mr. Molder did not
verify that the information provided to him by Plan Management
was accurate. Id. at 158:4-7.[22]

First, and most significantly, Mr. Molder did not know the
exact number of plan participants in his sample: he used the
number of employees of a given company as "the best proxy I had
for the number of participants." Id. at 161:23-162:3. Given that
the number of plan participants was a major determinant of the
pricing, it was error for the Court to have admitted Mr.

_____

[22] As Plan Management observes, Broadridge's argument as to Mr.
Molder's failure to independently verify the underlying data is
of little merit as Plan Management did not provide Mr. Molder
with projections as to lost profits. See ID Sec. Sys. Can., Inc.
v. Checkpoint Sys., Inc., 249 F. Supp. 2d 622, 695 (E.D. Pa.
2003); JMJ Enterprises, Inc., 1998 WL 175888, at *7 (E.D. Pa.
Apr. 15, 1998).

Molder's assumption without any basis in the factual record. Mr. Molder "was unable to locate any data" on whether "the number of employees equal the number of plan participants." Id. at 166:1-3. Mr. Molder provided no testimony as to his belief that the number of employees was the best proxy, at a one-to-one ratio, for the number of plan participants. "[N]othing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." Gen. Elec. Co. v. Joiner, 522 U.S. 136, 144 (1997).

Second, Mr. Molder did not try to determine the number of plan participants for any given company. He did not examine any data to determine the median percentage of employees of public companies who participate in equity compensation plans. Day 9 Tr. at 7:5-18, ECF No. 244. Nor did he review any of the discovery in the case that may have revealed the number of plan participants. Id. at 10:8-12. His calculations also did not specifically or intentionally include any of the data about the companies that Broadridge actually referred to Plan Management. Id. at 12:8-19:2. Mr. Molder was also unaware that the median number of plan participants of the companies referred to Plan Management by Broadridge was 98. Id. at 19:3-5. Mr. Molder noted

that "the record evidence of this case doesn't include the universe of potential referrals from Broadridge, and therefore it would bias the sample [to only use the companies that were actually referred]." Id. at 19:24-20:1.

An expert may make an assumption of fact "so long as such assumptions have a reasonable basis in the available record." Brill, 540 F. Supp. at 568. Here, however, too many of Mr. Molder's assumptions were not reasonably based in the record. There was no explanation for his assumption that the number of plan participants is equal to the number of employees. This assumption was especially crucial where, as here, the pricing was dependent on the number of plan participants. Accordingly, Mr. Molder's calculation must be stricken given that one of the crucial assumptions underlying his lost profits calculation of approximately $25,000,000.00 was not based in the trial record. Consequently, the damage award must be vacated in toto.

### B.    Broadridge's Motion for Judgment as a Matter of Law as to Damages or in the Alternative for a New Trial

Broadridge previously brought a motion for judgment as a matter of law under Federal Rule of Civil Procedure 50(a) following the close of Plan Management's case in the damages phase of trial. See Def.'s Mot., ECF No. 219. Broadridge now renews its motion for judgment as a matter of law as to damages, arguing that the expert testimony underlying the damages

calculation in this case was cherry-picked and not supported by facts in the trial record. Broadridge further argues that the evidence produced during the damages phase of trial was insufficient to allow the jury to calculate Plan Management's damages to a reasonable degree of certainty.

In response, Plan Management argues that there was a sufficient evidentiary basis for Mr. Molder's opinion, and that his opinion as to damages was within the range of "reasonable certainty" permitted by Pennsylvania courts. Plan Management also repeatedly points to Broadridge's failure to present its own damages expert. However, Plan Management bore the burden of proof as to damages; Broadridge was under no obligation to present any affirmative case as to damages. Plan Management raised this issue at the start of its closing, and counsel for Broadridge immediately objected. Day 9 Tr. at 71:13-23, ECF No. 244. The Court instructed the jury that Broadridge had "no burden, no obligation, or requirement" to offer its own expert. Id. at 71:24-72:2.

"Although mathematical certainty is not typically required, the general rule in Pennsylvania, as in most jurisdictions, is that if damages are difficult to establish, an injured party need only prove damages with reasonable certainty." ATACS Corp. v. Trans World Commc'ns, Inc., 155 F.3d 659, 669 (3d Cir. 1998). "At a minimum, reasonable certainty embraces a rough calculation

that is not 'too speculative, vague or contingent' upon some unknown factor." Id. at 669-70 (citing Spang & Co. v. U.S. Steel Corp., 545 A.2d 861, 866 (Pa. 1988)). Thus, some uncertainty in the amount of damages is permissible. Id. at 670.

Having found that Mr. Molder's calculation was not sufficiently based in the trial record and thus was erroneously admitted, the Court finds that in the absence of his testimony, there was insufficient evidence for the jury to reach a verdict as to damages. Without the testimony of Mr. Molder, Plan Management's damages were entirely speculative: the jury only had general information about pricing from the testimony of Ms. Thomas, as well as testimony from Mr. Miller that only 18 to 20 Viable Clients were ever referred. Thus, without testimony regarding the calculated retention rate, conversion rate, number of plan participants, and estimated costs avoided, any amount awarded by the jury would necessarily rely upon "some unknown factor." Id. at 669.

But, because there was some evidence of damages and Plan Management prevailed in the liability phase of trial, the Court finds that judgment as a matter of law in Broadridge's favor as to damages is inappropriate. See Cone v. West Va. Pulp & Paper Co., 330 U.S. 212, 215 (1947) ("[T]here are circumstances which might lead the trial court to believe that a new trial rather than a final termination of the trial stage of the controversy

would better serve the ends of justice."); <u>Mondis Tech. Ltd. v.</u>
<u>LG Elecs., Inc.</u>, No. 15-4431, 2020 WL 1933979, at *2, *5 (D.N.J.
Apr. 22, 2020) (denying a motion for judgment as a matter of law
where there was some evidence "from which the jury could
reasonably award some amount of damages" but granting a motion
for a new trial as to damages). Instead, the Court will grant
Broadridge's alternative motion for a new trial under Rule 59.

**C.   Broadridge's Motion to Amend the Judgment**

In the alternative to the new trial motion, Broadridge
seeks to have the Court alter or amend the judgment and reduce
the damage award to reflect the actual trial record. Def.'s Mot.
at 57, ECF No. 258. Broadridge argues that a damage award that
reflects the trial record would be 75 to 85% lower than the
$25,000,000.00 that the jury calculated (approximately
$3,750,000.00 to $6,250,000.00), "because that was the
difference between the numbers proffered by Mr. Molder, and the
numbers from the record." <u>Id.</u> at 58.

Plan Management argues that Broadridge has not presented
the Court with a sufficient legal basis nor a sufficient
alternative damages calculation to grant the motion for
remittitur. <u>See</u> Pl.'s Resp. at 74-75, ECF No. 269. Plan
Management states that remittitur is only appropriate where
there is no clear error with the verdict, but the size of the
verdict shocks the conscience of the Court. <u>Id.</u> Given that there

is no error in the verdict, Plan Management argues, remittitur
is not appropriate.

"The rationalization for, and use of, the remittitur is
well established as a device employed when the trial judge finds
that a decision of the jury is clearly unsupported and/or
excessive." Spence v. Bd. of Educ. of Christina Sch. Dist., 806
F.2d 1198, 1201 (3d Cir. 1986); cf. Linn v. United Plant Guard
Workers of Am., Local 114, 383 U.S. 53, 65-66 (1966) ("If the
amount of damages awarded is excessive, it is the duty of the
trial judge to require a remittitur or a new trial."). 
Remittitur may be proper where the district court concludes that
the evidence was too speculative to support the damages awarded
by the jury. Id. Remittitur is also appropriate where a damages
award "was contrary to all reason and . . . shock[s] the
conscience of the court." Gumbs v. Pueblo Int'l, 823 F.2d 768,
771-72 (3d Cir. 1987). An award "shocks the conscience of the
court" where it bears no rational relationship to the evidence
presented at trial. Id. at 773.

Here, remittitur is not appropriate. Having concluded that
a new trial as to damages is warranted because the damages are
speculative in the absence of Mr. Molder's report, the Court
cannot determine (1) whether the damages award was excessive,
contrary to reason, or shocking to the conscience, nor (2) the
appropriate measure of damages if in fact the award was

excessive, contrary to reason, or shocking to the conscience. Thus, the motion for remittitur will be denied.

### D.   **Plan Management's Motion to Award Interest**

Plan Management moves to alter or amend the judgment under Federal Rule of Civil Procedure 59(e), requesting that the Court add post-judgment interest at the rate of 4.73% on the judgment total, computed daily until the date of payment, and compounded annually, pursuant to 28 U.S.C. § 1961. See Pl.'s Mot. at 4-5, ECF No. 227. Plan Management requests that post-judgment interest be added to the judgment as it is statutorily mandated for all judgments in federal court. See 28 U.S.C. § 1961; Est. of Lieberman v. Playa Dulce Via, S.A., No. 14-3393, 2022 WL 2945247, at *14 (E.D. Pa. July 26, 2022) ("The award of post-judgment interest is governed by the federal post-judgment interest statute, 28 U.S.C. § 1961.") (Robreno, J.). Broadridge does not take a position on the propriety of post-judgment interest nor the calculation of the interest rate. Rather, Broadridge argues that because the judgment should be vacated or set aside, as argued in its other motions as to liability and damages, the Court should deny the motion for post-judgment interest as moot.

Having found that a new trial is required as to damages, the Court agrees with Broadridge. This motion will be denied as moot.

## V.   STAY OF EXECUTION

Under Federal Rule of Civil Procedure 62, "at any time after judgment is entered, a party may obtain a stay by providing a bond or other security. The stay takes effect when the court approves the bond or other security and remains in effect for the time specified in the bond or other security." Fed. R. Civ. P. 62(b). Broadridge seeks a stay, agreeing to post a supersedeas bond in the amount of $30,000,000.00. Plan Management agrees that this amount is appropriate. However, given that the Court grants Broadridge's motions as to damages and vacate the judgment, the Court denies this motion as moot.

## VI.   CONCLUSION

For the foregoing reasons, the Court will deny (1) Plaintiff Jonathan Miller's motion for a new trial as to the fraudulent inducement claim; (2) Broadridge's motion for judgment as a matter of law as to liability and damages; (3) Broadridge's motion to amend the judgment; (4) Plan Management's motion to amend the judgment; and (5) Broadridge's motion for a stay of execution. The Court will grant Broadridge's motion to strike the expert report of Michael Molder as well as Broadridge's motion for a new trial as to damages. Accordingly, the $25,000,000 damages award is vacated and a new trial on damages only shall be held.

An appropriate Order follows.